*In The*

# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 16-3607

AUSTIN J. WILLIAMS; MARK SILVERSTEIN,
Individually and on behalf of all others similarly situated

v.

GLOBUS MEDICAL, INC.; DAVID C. PAUL; RICHARD A. BARON;
DAVID M. DEMSKI; STEVEN M. PAYNE

AUSTIN J. WILLIAMS,

*Appellant*

---

*Appeal from an Order entered from the
United States District Court for the Eastern District of Pennsylvania*

## BRIEF AND APPENDIX FOR APPELLANT
## VOLUME I OF II (Pages A1-A26)

JACOB A. GOLDBERG, ESQ.
Email: jgoldberg@rosenlegal.com
KEITH R. LORENZE, ESQ.
Email: klorenze@rosenlegal.com
ROSEN LAW FIRM
101 Greenwood Avenue
Suite 440
Jenkintown, Pennsylvania 19046
(215) 600-2817

ROBERT V. PRONGAY, ESQ.
Email: rprongay@glancylaw.com
JASON L. KRAJCER, ESQ
Email:jkrajcer@glancylaw.com
CHARLES H. LINEHAN, ESQ.
Email: clinehan@glancylaw.com
GLANCY PRONGAY & MURRAY
1925 Century Park East
Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Attorneys for Appellant,
Austin J. Williams*

# FRAP 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Austin J. Williams, Appellant, certifies that Appellant is not a corporate party, does not issue stock, and is not controlled by any publicly-held corporation.


*/s/Jacob A. Goldberg*
Jacob A. Goldberg

**TABLE OF CONTENTS**

I.      JURISDICTIONAL STATEMENT ......................................................1

II.     STATEMENT OF THE ISSUES PRESENTED FOR
        REVIEW.............................................................................................1

III.    STATEMENT OF THE CASE .........................................................2

        A.      Procedural History...........................................................2

        B.      Statement Of Facts...........................................................3

        C.      Summary Of Rulings Presented For Review ...................8

IV.     SUMMARY OF ARGUMENT .......................................................10

IV.     STATEMENT OF RELATED CASES ..................................10

V.      STANDARD OF REVIEW ...................................................13

VI.     ARGUMENT ...........................................................................14

        A.      Globus's Risk Disclosures Were Materially Misleading..............14

                1. Risk Disclosures That State Future Hypothetical Risks
                   Trigger A Duty To Disclose Material Present
                   Realizations Of Those Risks.................................................16

                2. Globus's Risk Disclosures Concerning Distributor
                   Disruption Were Materially Misleading In Failing
                   To Disclose The Vortex Termination ...................................20

                        a)      Globus's Risk Disclosures Encompass
                                Cessation Of Significant Distributor
                                Relationships Irrespective Of Who Elects To
                                Terminate The Relationship........................................21

(1) **The District Court Misread The Plain, Unequivocal Language Of The Risk Disclosures**................................................................22

(2) **The District Court's Distinction Between "Risk" And "Business Decision" Has No Meaning Or Effect**...................................................27

b) **Even Under The District Court's Artificially Narrow Reading Of Globus's Risk Disclosures, Defendants Had A Duty To Disclose The Cessation Of The Distributor Relationship With Vortex**....................................................31

B. **The Complaint Adequately Pleads The Falsity Of Defendants' 2014 Revenue Forecast**.........................................32

C. **Defendants Cannot Avail Themselves Of The PSLRA Safe Harbor**........................................................................43

1. **Defendants' Cautionary Language Was Not "Meaningful"**..............................................................44

2. **Defendants Issued Their 2014 Revenue Forecast With Actual Knowledge Of Its Falsity**.............................47

VII. **CONCLUSION**..............................................................................53

# TABLE OF AUTHORITIES

## Cases

*Berkowitz v. Conrail, Inc.*,
No. 97-CV-1214 DWV, 1997 WL 611606 (E.D. Pa. Sept. 25, 1997)..........17

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................19

*California Pub. Emp'ees Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ........................................................................37

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ....................................................... 32, 36, 39, 40

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ........................................................................42

*Flynn v. Sientra, Inc.*,
No. 15-CV-07548 SJO, 2016 WL 3360676 (C.D. Cal. June 9, 2016)... 17, 19

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ........................................................................44

*Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015)........................................................................19

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ........................................................................19

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999)............................................................16

*In re: BP p.l.c Sec. Litig.*,
No. 10-MD-2185 KPE, 2016 WL 3090779
(S.D. Tex. May 31, 2016)............................................................................35

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ........................................................ 14, 33, 37

*In re Cambrex Corp. Sec. Litig.*,
No. 03-CV-4896 WJM, 2005 WL 2840336 (D.N.J. Oct. 27, 2005)............45

*In re Emerson Radio Corp. Sec. Litig.*,
No. 03-CV-4201 JLL, 2005 WL 8131267 (D.N.J. Dec. 20, 2005)..............45

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................19

*In re Home Health Corp. of America, Inc. Securities Litigation*,
 No 98-CV-834 WHY, 1999 WL 79057 (E.D. Pa. Jan. 29, 1999)................28

*In re MobileMedia Sec. Litig.*,
 28 F. Supp. 2d 901 (D.N.J. 1998).................................................................47

*In re Nash Finch Co.*,
 502 F. Supp. 2d 861 (D. Minn. 2007) ........................................................51

*In re Trump Casino Sec. Litig.*,
 7 F.3d 357 (3d Cir. 1993) ..................................................................... 44, 45

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ........................................................................38

*In re Westinghouse Sec. Litig.*,
 90 F.3d 696 (3d Cir. 1996) ................................................................... 19, 47

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ............................................................... passim

*Kline v. First W. Gov't Secs., Inc.*,
 24 F.3d 480 (3d Cir. 1994) ................................................................... 16, 17

*Matrixx Initiatives v. Siracusano*,
 563 U.S. 27 (2011)................................................................... 16, 17, 18, 48

*Moolen Holding N.V. Sec. Litig.*,
 405 F. Supp. 2d 388 (S.D.N.Y. Dec. 13, 2005)............................................19

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
 834 F.3d 481 (3d Cir. 2016) ........................................................................43

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 135 S. Ct. 1318 (2015)......................................................................... 33, 34

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000) ........................................................................14

*Phillips v. County of Allegheny*,
 515 F.3d 224 (3d Cir. 2008) ........................................................................24

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ........................................................................19

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) .................................................................. 19, 38

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ........................................................................38

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992) ........................................................................16

*Silverstein v. Globus Med., Inc.*,
   No. CV 15-5386, 2016 WL 4478826 (E.D. Pa. Aug. 25, 2016) .......... passim

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ............................................................. 17, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).....................................................................................48

*Voit v. Wonderware Corp.*,
   977 F. Supp. 363 (E.D. Pa. 1997).................................................................18

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir.2007) .........................................................................14

**Statutes**

15 U.S.C. §78aa ...............................................................................................1

15 U.S.C. §78u-4 ..............................................................................................2

15 U.S.C. §78u–5 ............................................................................................43

28 U.S.C. §1291 ...............................................................................................1

28 U.S.C. §1331 ...............................................................................................1

28 U.S.C. §1337 ...............................................................................................1

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................2

Fed. R. Civ. P. 12(b)(6)....................................................................................2

## I.    JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Pennsylvania had jurisdiction over this action pursuant to Section 27 the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

Plaintiff Austin J. Williams ("Plaintiff") appeals from the district court's (i) Memorandum Opinion, entered on August 25, 2016, granting the Defendants' motion to dismiss (A1-A22); (ii) Order of dismissal, entered on August 25, 2016, which was a final order and judgment (A23); and Order Denying Plaintiff's Motion for Reconsideration, entered on September 12, 2016 (A322).  Plaintiff filed a timely Notice of Appeal on September 13, 2016.  (A24).

## II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

A.    Did the district court err in holding that the Complaint fails adequately to allege that Defendants had a duty to disclose that Globus had determined to terminate, and actually had terminated, a significant independent distributor when those circumstances arose prior to its warning investors that a significant independent distributor's ceasing to sell Globus products could adversely affect sales.

B.    Did the district court err in holding that the Complaint failed adequately to allege that Defendants' false 2014 revenue projection was actionable.

1

## III.   STATEMENT OF THE CASE

### A.    Procedural History

On September 29, 2015, plaintiff Mark Silverstein filed a class action complaint for violations of the Federal Securities Laws against Appellees, individual defendants Richard A. Baron, David M. Demski, David C. Paul, Steven M. Payne and Globus Medical, Inc. ("Globus" or "Company" and with the individual defendants, "Defendants"), in the United States District Court for the Eastern District of Pennsylvania.  (A29, ECF No. 1).   On November 30, 2015, Plaintiff filed a motion for appointment as lead plaintiff and for the appointment of The Rosen Law Firm ("Rosen Firm") and Glancy Prongay & Murray, LLP ("Glancy Firm") as Co-Lead Counsel for him and the Class.  (A29, ECF No. 2).  The district court granted that motion on January 15, 2016.  (A30, ECF No. 14).

On February 19, 2016, Plaintiff filed an Amended Class Action Complaint ("Complaint").  (A30, ECF No. 18).  On March 28, 2016, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the pleading standards set forth in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, *et seq*.  (A30-A31, ECF No. 20).  On May 5, 2016, Plaintiff opposed Defendants' Motion to Dismiss, (A31, ECF No. 24), and on June 2, 2016, Defendants filed a reply in further support.  (A31, ECF No. 27).

On August 10, 2016, the district court held oral argument on Defendants'
motion to dismiss.  (A31, ECF No. 32).  On August 25, 2016, the district court issued
an Opinion (A31, ECF No. 37; A1-A22)[1] and an Order (A-31, ECF No. 38; A23),
dismissing Plaintiff's claims with prejudice.  On September 8, 2016, Plaintiff filed
a Motion for Reconsideration (A31, ECF No. 40).  On September 12, 2016, the
district court issued an Order, denying Plaintiff's motion for reconsideration.  (A32,
ECF No. 41; A322).  On September 13, 2016, Plaintiff timely filed his Notice of
Appeal, appealing the district court's Order.  (A32, ECF No. 42; A24).

## B.    Statement Of Facts

Globus is "a medical device company focused exclusively on the design,
development and commercialization of musculoskeletal implants."  (A34, ¶2).  In
2004, Globus entered into an Exclusive Distributorship Agreement ("EDA") with
Vortex, pursuant to which Vortex agreed to serve as the exclusive distributor of
Globus implant products within a territory encompassing certain portions of
Louisiana and Mississippi.  (A35, ¶5).  Globus and Vortex renewed the EDA in 2008
and again in 2010.  *Id.*  The 2010 EDA set an expiration date of December 31, 2013.
*Id.*

---

[1] Westlaw published the district court's Opinion as *Silverstein v. Globus Med., Inc.*,
No. CV 15-5386, 2016 WL 4478826 (E.D. Pa. Aug. 25, 2016).

3

James Long ("Long") founded Vortex, which, from 1997 to 2004, distributed other manufacturers' spinal implant products. (A35, ¶4). Long developed significant goodwill among prominent surgeons in the southeast United States, including Dr. John Steck ("Steck"), the single largest prescriber of Globus products in the United States. *Id.* Many Vortex customers, including Steck, remained loyal to Long and began purchasing Globus products following execution of the EDA. (A42, ¶27).

By late 2013, Globus became a publicly traded company. At the same time, unbeknownst to investors, Globus became concerned about the concentration of its revenues through Vortex. (A42, ¶29). Steck had become the single largest prescriber of Globus spine implants, and the Company sought to reduce the amount of commissions it was paying to Vortex. (A35-A36, ¶6; A42, ¶28-29). With the 2010 EDA extension about to expire, Globus determined that it would refuse to renew the Vortex EDA and instead recruit new in-house sales representatives to cover the Vortex territory. (A43, ¶30).

Globus knew, however, that replacing Vortex with in-house sales representatives would take time, and the Company feared that Vortex would cease doing business and take Steck and his other valuable clients if Vortex learned of the Company's plans. (A43, ¶¶31-32). Accordingly, during a four-month extension period, Globus deceived Long, pretending to negotiate an EDA extension, while it

4

developed its in-house sales team for the southeast United States.  (A43, ¶32). Globus used the extension to misappropriate Vortex's confidential, proprietary customer information for its new sales staff to facilitate its efforts to retain Vortex's clients. *Id*.

On February 26, 2014, Globus held an earnings conference call ("February 26 Call") in which Defendants Paul, Baron, and Demski participated, announcing 2014 revenue guidance "in the range of $480 million to $486 million."  (A51, ¶48). Defendants issued that forecast, knowing that they included revenue from Vortex that they did not anticipate capturing, once they terminated Vortex. *Id*.  Defendants reiterated that revenue guidance in their April 29, 2014 earnings conference ("April 29 Call"), (A51, ¶49; A52, ¶51), knowing, in fact, that by that time, Globus had terminated Vortex.  Further, Defendants knew the risk that termination of a "significant" distributor such as Vortex would have a material, negative impact upon the Company's business, results of operation, and financial condition. *Id*.  Based on the Company's experience with "distributor turnover" in 2010, Defendants knew that it was going to take the Company anywhere from one to two years before it would recover financially from the loss of Vortex. *Id*.

On or about April 18, 2014, with its new sales staff in place, and having obtained Vortex's sensitive customer data, Globus constructively terminated Vortex, presenting Long with a "take it or leave it" EDA extension that was wholly divorced

from the terms of the prior EDAs and required Long to turn over all of his customers to Globus in return for a royalty payment.  (A44, ¶35).  Just as Globus expected, Vortex and Long rejected the EDA extension.  (A44, ¶35; A45, ¶36).

Despite Defendants' knowledge of the facts above, they failed to disclose them to investors during the February 26 and April 29 Calls.  (A52, ¶50; A53, ¶53). Defendants also failed to disclose that Vortex's termination would substantially and adversely impact the Company's results of operations in the Company's annual and quarterly reports filed with the SEC on March 14, 2014 ("2013 10-K") and April 30, 2014 ("April 30 10-Q"), respectively.  *Id.*

On August 5, 2014, Globus issued a press release (the "August 5 Press Release"), announcing its financial results for the second fiscal quarter of 2014 and substantially lowering its revenue guidance for the 2014 fiscal year.  (A53, ¶54). The Company advised investors that it "now expects full year net sales to be in the range of $460 to $465 million" – a drop of $20-21 million from its January 2014 and February 2014 projections.  *Id.*

During the Company's August 5, 2014 earnings conference call ("August 5 Call"), Defendant Demski noted that sales growth had lagged behind historical rates, attributing it, in part, to Defendants' termination of Vortex and the negative impact that termination had on sales.  (A53, ¶55).  Defendant Baron stated that "the decision not to renew the distributor and the impact to pricing will affect our top line

expectations.  We now expect full year revenue to be in the range of $460 million to $465 million."  (A53, ¶¶54-55); (A327).  Defendant Demski added that, at the time Globus made the decision to terminate its relationship with Vortex, Defendants "understood the risk to our short-term results," and that the loss of Vortex would cause Globus "short-term pain."  (A325).  He then expressed hope that the Company "will be able to recoup these losses and more in the future."  *Id.*

During the August 5 Call, Defendants explained the contribution of certain pricing pressure that, they claimed, contributed to their adjusting the 2014 revenue forecast materially downward.  Defendant Demski explained that the Company was "able to mitigate this [pricing] pressure to some extent by shifting the mix towards new and better technology."  (A325).  Defendant Baron confirmed that pricing pressure was ***not a significant factor*** in the downward revision of the forecast, stating that the Company expected to "see some mitigation of that price decline through the introduction of new products."  (A330).  When asked by an analyst during the August 5 Call whether Globus "would have changed guidance if not for the distributor issue, and it was just pricing," Defendant Baron replied, "I don't think we should comment on that."  (A336).

Defendants provided additional color on the significance of the Company's loss of Vortex revenues during the August 5 Call.  Before asking "why this [distributor issue] wasn't disclosed earlier on in the quarter," one incredulous analyst

7

informed Defendants that "I guarantee you, from all the emails that I am getting, that investors view this as a material disclosure." (A330). Defendant Demski responded to the analyst only by stating: "Well, I don't think it rises to the level of materiality. We have looked at that from a legal standpoint, and it doesn't rise to that level." *Id.* Defendant Demski also admitted that the Company had "lost a significant amount of [Vortex's business]," and that "to get back to the levels that it was . . . that will take at least a year to work through that cycle and probably more." (A328). Later, in response to an analyst's statement recalling that the Company's 2010 instance of "distributor turnover" required "about a year to 15 months to get that territory back up to where it had been," Defendant Baron confirmed that the analyst's recollection was "accurate." (A332).

On this news the price of the Company's shares fell $4.05 per share, or 17.9%, to close on August 6, 2014 at $18.51 per share, on unusually heavy trading volume. (A54, ¶56).

### C.    Summary Of Rulings Presented For Review

Plaintiff's Complaint asserted two sets of claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5. First, the Complaint alleged that Defendants' risk disclosures in the 2013 10-K and April 30 10-Q were materially misleading because they specifically identified a risk that the Company's sales could be adversely affected if any of the Company's significant independent distributors

ceased doing business with Globus and distributing its products, but failed to disclose that this risk had already materialized when Defendants determined to and then actually terminated Vortex. (A46, ¶41-A51, ¶47; A58, ¶¶68-71). Second, the Complaint alleged that Defendants' statements providing 2014 revenue guidance during the February 26 and April 29 Calls were materially false and misleading because they incorporated projected Vortex sales figures for the remainder of the 2014 fiscal year, even though Defendants had actual knowledge that (i) as of February 26, they had determined to terminate Vortex, (ii) as of April 29, they actually had terminated Vortex, and (iii) the Vortex termination would have a substantial, negative impact on the Company's revenues and it would take anywhere from one to two years for Globus to recover. (A51, ¶48-A53, ¶53; A58, ¶¶68-71). The Complaint also asserted control person claims under Section 20(a) of the Exchange Act against each of the Defendants, alleging that the individual defendants were controlling persons of Globus and that Globus was a controlling person of the individual defendants. (A59, ¶72-A60, ¶78).

The district court dismissed Plaintiff's claims based on Defendants' misleading risk disclosures, holding that Defendants had no duty to disclose their decision to terminate and the actual termination of Vortex and that Defendants' risk disclosures were not misleading for omitting to disclose these facts. (A19-A21). The district court also dismissed Plaintiff's claims based on Defendants' false 2014

revenue guidance, holding that the Complaint failed adequately to plead falsity and scienter, and that the PSLRA's safe harbor for forward-looking statements protected these statements from liability. (A10-A16). Finally, the district court dismissed Plaintiff's Section 20(a) claims, holding that Plaintiff failed adequately to plead an underlying Section 10(b) claim. (A22).

## IV.    **STATEMENT OF RELATED CASES**

At this time, Appellants are unaware of any current related case pending before this or any other Court.

## V.    **SUMMARY OF ARGUMENT**

The district court erred, holding that Defendants had no duty to disclose either its determination to terminate Vortex as an independent distributor or its ultimate termination of Vortex. It found no duty to disclose, notwithstanding Defendants' warning of the precise risk at issue.

It is black letter law that when an issuer chooses to speak about an issue – for example, by choosing to warn of a possible risk – that it is duty-bound to disclose all material facts that render that disclosure truthful and complete. Thus, no legal question exists that if an actual, material circumstance about which an issuer warns already exists at the time it discloses the risk warning, it must disclose the material circumstance. Knowing or reckless failure to disclose in that context is actionable securities fraud. That is exactly what happened here.

10

Ignoring the plain language of Defendants' risk disclosures about the adverse effect on sales if a significant independent distributor ceased selling Globus products, the district court held that Globus's terminating Vortex was not the circumstance about which Defendants warned. This reading of Defendants' risk disclosures wholly rejects the plain meaning of the risk disclosures' words. Without any basis whatsoever, the district court inserted a condition to the risk disclosures that simply does not exist. Rather than an independent distributor's ceasing to sell Globus product adversely affecting sales, the district court insisted that the risk disclosures were limited to the situation where an independent distributor, itself, chooses to stop selling Globus products. The district court's addition of words, limiting Defendants' risk disclosures was wholly improper – Indeed, Defendants failed even to raise this argument in the briefing below.

Worse still, however, the district court wholly ignored that in April, 2014, prior to Defendants' repeating their misleading risk disclosures and informing investors that nothing had changed, it was Vortex who rejected the new EDA. Thus, even if this Court accepts the district court's revisions to Defendants' risk disclosures, what actually occurred in April, 2014 actually met the district court's limitation. As such, the district court's holding that Defendants were not duty-bound to disclose their intention to and ultimate termination of Vortex – a material

circumstance of which Defendants had actual knowledge – constitutes reversible error.

Next, the district court erred in finding that Defendants 2014 revenue forecast was not actionable. The district court erred in concluding that the Complaint's allegations of falsity are conclusory or based on speculation. The district court overlooked Defendants' own statement admitting that the primary reason for the downward revision of their original forecast was to account for their termination of Vortex and the resulting financial impact. Had they excluded projected Vortex revenues from the original forecast, Defendants would not have needed to revise it in response to losing all material sales from Vortex. The Complaint therefore adequately pleads that Defendants' 2014 forecast was misleading.

The district court also erred in concluding that Defendants' 2014 revenue forecast was immunized by the PSLRA safe harbor. Contrary to the district court's finding, the cautionary language accompanying Defendants' forecast was not meaningful. Although Defendants' warning of the loss of independent distributors was sufficiently tailored to the circumstances that had materialized by the beginning of the Class Period, such cautionary language was misleading under the circumstances. At the time Defendants warned of the general, hypothetical risk of the loss of *any* distributor, Globus's actions had made the loss of Vortex imminent or actual. Therefore, Defendants' cautionary language was not meaningful.

12

The district court also ignored the Complaint's allegations in wrongly determining that Defendants did not have actual knowledge of the falsity of their 2014 revenue forecast.  Knowing that they had included material Vortex revenue in their forecast when they knew Vortex's termination was either imminent or had already occurred, and that the loss of a significant distributor would cause a loss of a material amount of revenue, Defendants admitted that they "understood the risk to our short-term results," with the knowledge that such a decision would "negatively impact[] our sales" and result in "short-term pain."  Combined with Defendants' recent prior experience with "distributor turnover," the distinct characteristics of the market for spinal implant products, and the nature of the relationship between Vortex and its customers, the truth of which the district court was required to assume, these allegations adequately pleaded Defendants' actual knowledge that the 2014 revenue forecast's inclusion of Vortex revenue was misleading.

Accordingly, the district court erred in dismissing the Complaint and this Court should reverse its order and remand for further proceedings.

## VI.    STANDARD OF REVIEW

This Court "exercise[s] plenary review over the District Court's dismissal of the Complaint for failure to meet the pleading requirements of the PSLRA and over the District Court's interpretation of the federal securities laws." *Institutional Inv'rs*

13

*Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citing *Winer Family Trust v. Queen,* 503 F.3d 319, 325 (3d Cir.2007)).

## VII.  ARGUMENT

### A.    Globus's Risk Disclosures Were Materially Misleading

The district court erred, holding that Defendants had no duty to disclose either their decision to terminate or their subsequent termination of Vortex, even as they warned, in detailed risk disclosures, about the adverse effect on Globus's sales from the loss of an independent distributor.

The district court concluded that the Complaint pled facts sufficient "to support an inference that Globus knew it was planning to terminate the Vortex relationship prior to the March 13, 2014 10-K and knew that it had already terminated Vortex by the time it filed its April 30, 2014 10-Q." (A17).  The district court also concluded that Defendants' termination of Vortex was a material omission under this Court's standard for materiality in an efficient market.  *See* (A17-A19) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)).  Globus's eventual disclosure of the Vortex termination was immediately followed by a significant drop in Globus's stock price, which suffices to "show[] materiality under *Burlington-Oran*." *See* (A19).

But somehow, in the face of a finding of materiality and scienter, the district court held that Defendants had no duty to disclose either their intention to terminate or their termination of Vortex. Notably, in 44 pages of motion to dismiss briefing below, Defendants did not raise this duty to disclose argument on which the district court ultimately relied. *See, e.g.*, (A95-A97; A230).[2] Instead, Defendants offered only a one paragraph argument, claiming that the risk disclosures were not misleading, (A95), and contending that the Complaint failed to show that they intended to and then did terminate Vortex. *See* (A95-97; A230).[3]

Thus, the district court found that Defendants had actual knowledge of the omitted facts at the times they spoke and that these omitted facts were material to investors. Because Defendants affirmatively included in their risk disclosures the ramifications to the Company of the loss of an independent distributor, they were duty-bound to disclose that Vortex would and ultimately did cease distributing Globus products – the material information they omitted. The district court's conclusion to the contrary defies this Court's and the Supreme Court's precedents

---

[2] To the contrary, Defendants argued that the risk disclosures were specifically tailored to the risk of distributor terminations and covered a specific past instance when Globus had terminated a different distributor. *See infra* at §A2a)(1).

[3] As mentioned above, the district court found against the Defendants on this point, concluding that the Complaint did plead with particularity that Defendants intended to (by no later than March 13, 2014) and then did terminate Vortex (by no later than April 30, 2014).

and any reasonable, plain reading of the risk language at issue. Defendants' knowing omission of any mention of their determination to terminate Vortex, who sold to the single largest prescriber of Globus's products in the United States, rendered their risk disclosure statements actionable.

1.    **Risk Disclosures That State Future Hypothetical Risks Trigger A Duty To Disclose Material Present Realizations Of Those Risks**

Defendants may not mislead investors. Defendants had an affirmative duty to disclose all material information necessary to render their statements accurate, complete, and not misleading. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 44 (2011) (citing 17 C.F.R. §240.10b-5(b)); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) (choosing to speak on a particular subject, "defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully"); *Kline v. First W. Gov't Secs., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) (choosing to speak, speaker is duty-bound "not to omit" material information necessary not to mislead, including "any additional or qualifying information, ***then known***, the absence of which would render misleading that which was communicated") (citation omitted) (emphasis added).[4]

---

[4] *See also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading.")

Because Defendants had determined to terminate Vortex, their risk warnings of the potential effects of such a termination were materially misleading because they omitted Defendants' intention to terminate and actual termination of Vortex. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172, 1181 (9th Cir. 2009) (holding actionable a description of "the risks of product liability claims in the abstract" while failing to disclose that the risk "may have already come to fruition"), *aff'd*, 563 U.S. at 47; *Flynn v. Sientra, Inc.*, No. 15-CV-07548 SJO, 2016 WL 3360676, at *10-12 (C.D. Cal. June 9, 2016) (holding risk disclosures, warning of the possibility of improper manufacturing practices compliance issues, actionable in context of complaint's "allegations that serious regulatory issues had already transpired by the time these statements were made").

The Supreme Court's decision in *Matrixx* makes it unequivocally clear that once an issuer determines to speak, it must speak all material facts necessary to render its statement complete, accurate and not misleading. *See* 563 U.S. at 44-45, 47. More specifically, *Matrixx* makes clear, as the district court acknowledged (A21),[5] "that when a company identifies risks it has a duty to speak truthfully

---

(citing *Kline*, 24 F.3d at 491); *Berkowitz v. Conrail, Inc.*, No. 97-CV-1214 DWV, 1997 WL 611606, at *14 (E.D. Pa. Sept. 25, 1997) (same).

[5] The district court's statement quoted above was not used to describe *Matrixx*, but instead was its characterization of the holding of *Flynn*, 2016 WL 3360676 at *11. The district court incorrectly held that *Flynn* represented a "separate theory" for the

concerning whether such risks have already come to pass."  Critically, *Matrixx*, like this case, involved an allegedly misleading passage in the "Risk Factors" section of a company's SEC filing.  *See* 585 F.3d at 1172, 1181, *aff'd*, 563 U.S. at 47.  As the Ninth Circuit explained in the underlying decision affirmed by the Supreme Court, the passage in the defendant's Risk Factors was misleading because it spoke "about the risks of product liability claims ***in the abstract, with no indication that the risk may already have come to fruition***."  585 F.3d at 1181 (emphasis added) (internal quotation marks omitted).  "It did not disclose. . . that two plaintiffs had already sued Matrixx for allegedly causing them to lose their sense of smell."  563 U.S. at 34.  Under these facts, the Supreme Court affirmed "the Court of Appeals' holding that respondents adequately pleaded the element of a material misrepresentation or omission."  *Id.* at 47.

Multiple additional courts have similarly held that risk disclosures which state a risk in abstract, hypothetical terms trigger a duty to disclose any material realizations of that risk which have already come to pass and, correspondingly, that a failure to disclose such materializations renders those risk disclosures materially misleading.  *See, e.g.*, *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 370-71 (E.D. Pa. 1997) (warning regarding loss of key employees materially misleading when

---

establishment of a duty to disclose that was somehow outside the parameters set by *Oran*.  (A20).

company had already replaced the key employee), *abrogated on other grounds by In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warning that factors "may" negatively affect revenue were materially misleading where factors already "had" negatively affected revenue); *Flynn*, 2016 WL 3360676, at *10-12.[6] As discussed above, this "theory" of liability was directly endorsed by the Supreme Court in *Matrixx*.

The district court somehow found that Plaintiff had advanced a "separate theory" for Defendants' duty to disclose. (A20). This is not so. Plaintiff's only "theory" is that binding Supreme Court precedent requires that once an issuer determines to speak on an issue, it must disclose all material facts that render the

---

[6] *See also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. Dec. 13, 2005) (cautionary statements actionable where plaintiff alleged that warnings about regulatory risks failed to disclose that company's employees were already violating NYSE rules); *cf. In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) ("'to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'") (quoting *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994)); *Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 13 (D.C. Cir. 2015) ("there is an important difference between warning that something '*might*' occur and that something '*actually* had' occurred) (emphasis in original); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (cautionary language was misleading because it "speaks entirely of as-yet-unrealized risks and contingencies" and "[n]othing alerts the reader that some of these risks may already have come to fruition").

statement on that issue complete, accurate and not misleading.

Accordingly, when Defendants warned of the adverse effect on Globus's sales from any of its significant independent distributors' ceasing to distribute its products, they were duty-bound to disclose any material realizations of that risk that had already occurred.[7]  Their failure to disclose is actionable, and the district court erred in holding that Defendants had no duty to disclose.

> **2.    Globus's Risk Disclosures Concerning Distributor Disruption Were Materially Misleading In Failing To Disclose The Vortex Termination**

The district court erred, holding that no duty to disclose arose in this case because "the risk that Globus identified in its disclosures was not the same as the event that Plaintiff alleges had come to pass." (A21).  In particular, the district court held that the cessation of the Vortex distributor relationship did not fall within the category of disclosed risk because Globus made a "business decision" to terminate the relationship, rather than Vortex electing to terminate the relationship.  *Id.*  The district court's holding both misreads the plain language in Globus's risk disclosures and creates an artificial dichotomy between "business decisions" and "risks" that has

---

[7] This, of course, makes sense in the context of investor expectations.  If you warn investors of a material risk, surely they expect you to disclose if that material risk has already come to fruition, especially when the company is discussing that risk in an SEC filing.

no basis in the law, logic or business reality.  Moreover, even if the district court's

erroneous reading of Globus's risk disclosures were correct, Defendants were still

duty-bound to disclose the termination because technically, Vortex ultimately

elected to cease to do business with Globus.

> **a)**     **Globus's Risk Disclosures Encompass Cessation Of Significant Distributor Relationships Irrespective Of Who Elects To Terminate The Relationship**

The risk disclosures at issue here stated:

> Our operating results are directly dependent upon the sales and marketing efforts of not only our employees, but also our independent distributors.  ***We expect our direct sales representatives and independent distributors to develop long-lasting relationships with the surgeons they serve.***  If our direct sales representatives or independent distributors fail to adequately promote, market and sell our products, our sales could significantly decrease.

> We face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network.  If any of our direct sales representatives were to leave us, or ***if any of our independent distributors were to cease to do business with us, our sales could be adversely affected.  Some of our independent distributors account for a significant portion of our sales volume, and if any such independent distributor were to cease to distribute our products, our sales could be adversely affected.***

(A46-A47, ¶41).[8]

---

[8] Defendants included these risk disclosures in Globus's March 14, 2014 10-K and in its April 30, 2014 10-Q, incorporating by reference the risk factors from its March 14, 2014 10-K and stating that "there have been no significant changes" to Globus's risk profile.  (A49, ¶44-A50, ¶45).

These risk disclosures warned broadly of the risk of disruption in Globus's marketing, distribution and sales that could occur "if any of our independent distributors were to cease to do business with us," especially if that independent distributor "account[ed] for a significant portion of our sales volume." Vortex was precisely such a significant distributor. Indeed, on August 5, 2014, when Defendants lowered revenue guidance for FY 2014, they attributed the reduced guidance to lower sales growth in part to Globus's "decision not to renew our existing contract with a ***significant U.S. distributor*** [*i.e.*, Vortex], negatively impacting our sales." (A53-A54, ¶55) (Emphasis added).

Nonetheless, the district court found that Globus's decision to terminate Vortex and the subsequent actual cessation of Vortex's distributor relationship was "something different" than the risk contemplated by Globus's risk disclosures. (A21). Specifically, the district court held that the risk factor only warned of the risk that a distributor might "elect not to work with Globus," whereas what actually happened was Globus making a "business decision" to terminate Vortex "on its own initiative." *Id*.

### (1) The District Court Misread The Plain, Unequivocal Language Of The Risk Disclosures

The plain language in the risk disclosures does not support the district court's distinction between a distributor "electing" not to do business with Globus and

22

Globus's making a business decision to terminate a distributor. Parsed correctly, Defendants warned, "if any [significant] independent distributor were to *cease* to distribute our products, our sales could be adversely affected." (A47, ¶41) (Emphasis added). Cease means stop or halt. Thus, the risk warns of an independent distributor's stopping the sale of Globus products. It mentions nothing whatsoever about who makes the decision to stop those sales. This is plain English. In the precise words of the risk disclosures, Vortex did in fact "cease to do business" with Globus and did in fact "cease to distribute" Globus's products, regardless of who terminated whom. Globus did not limit the scope of its risk disclosures to situations where a distributor "*elects* to cease to do business" with Globus or "*elects* to cease to distribute" its products. The district court erred, reading a limitation into the risk disclosures that simply was not there.[9]

Moreover, the focus of both the authors of the risk disclosures and the audience receiving it was on the ***adverse effect on sales*** from losing a significant distributor, not who terminated whom. From a reasonable investors' perspective, during the August 5, 2014 conference call in which Defendants announced the reduced guidance and the termination of Vortex, none of the analysts pressed Defendants about who terminated whom or the details about how or why the relationship ended. A328-A340). Instead, analysts pressed Defendants about the

---

[9] Defendants raised this for the first time at oral argument. (A249, ll. 10-15).

*effect* of the Vortex termination on sales and why Defendants had not disclosed this clearly material information earlier. *See, e.g.*, (A333) ("I was just hoping you could give a little bit broader perspective on, to what extent do you think we need to monitor things like this, and factor the potential for contact losses into our thinking of the stock on a go forward basis"); (A330) (". . .you commented that the distributor issue happened at the beginning of the quarter. And I guarantee you from all the emails I am getting, that investors view this as a material disclosure").

From the author's perspective, Globus's risk disclosures were intentionally written to cover a broad range of events which might disrupt Globus's distribution network and thereby adversely affect sales. Indeed, securities issuers have an incentive to write their risk disclosures broadly to cover as many circumstances as possible, so that they can protect themselves and their officers from liability for forward-looking statements. In this case, Globus's risk factors in its March 14, 2014 10-K spanned 19 pages of densely written text. It is reversible error, therefore, for the district court artificially to have limited the meaning of Globus's risk disclosures when Defendants wrote it expansively for their own protection. This is especially true on a motion to dismiss, where the district court was required to take all allegations in the Complaint as true and draw all reasonable inferences therefrom in Plaintiff's favor. *See, e.g.*, *Avaya*, 564 F.3d at 264, n. 36 (quoting *Phillips v. County*

*of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)) (accepting "all factual allegations as true" and construing "the complaint in the light most favorable to the plaintiff").

That Globus's risk disclosures encompass terminations of distributors by Globus is most clearly illustrated by Defendants' own words. In their opening brief in support of their motion to dismiss, Defendants argued that the challenged risk disclosures constituted "meaningful cautionary language" under the PSLRA's safe harbor because it was specifically tailored to the risk of distributor disruption. (A87-A93).[10] In particular, Defendants stated that "Globus provided detailed risks concerning its reliance on independent distributors" and that these "warnings about its relationships with its independent distributors were ***not hypothetical***" because Globus "provided a specific discussion about a relationship with an independent distributor [L5 Surgical] ***that was ultimately terminated*** and led to litigation." (A90) (Emphasis added). Thus, Defendants claimed that the risk disclosures at issue were "not hypothetical" because they covered a specific prior instance in which ***Globus had terminated an independent distributor***. That is a direct acknowledgment that the distributor risk disclosures encompassed situations in which Globus terminated

---

[10] *See also* (A229) (arguing that risk disclosures were not "boilerplate" because it "specifically warned" that "sales could significantly decrease based on the ***cessation of an independent distributor*** who accounts for a significant portion of our sales") (emphasis added) (internal quotation marks and brackets omitted).

distributors, not just situations in which distributors elected not to do business with Globus.

At oral argument, however, Defendants reversed course and argued that the risk disclosures only warned about situations where distributors elected to stop doing business with Globus.[11]  Both Defendants and the district court ignored the obvious implication of this turn-about: if the risk disclosures did not apply to situations like the Vortex termination, then, as argued below, the risk disclosures cannot have constituted "meaningful cautionary language."[12]   Putting that issue aside, Defendants' original interpretation was the correct one.  The risk disclosures clearly encompassed all situations where distributors ceased to do business with Globus, irrespective of who terminated whom.

---

[11] Counsel for Defendants stated at the hearing that "[t]he hypothetical . . . risks that [Defendants] were going to lose distributors and they were going to leave and go onto competitors is not what happened.  We decided, Globus decided that it was in its interest to terminate this distributor.  That is not the risk that we were lying about supposedly."  (A249, ll. 10-15).

[12] As Defendants observed in their motion to dismiss, "[t]o comply with the Safe Harbor, cautionary language must be extensive, specific, and *directly related to the alleged misrepresentation*."  (A91) (Emphasis added, internal quotation marks and brackets omitted).  The district court's holding, therefore, that the Vortex termination "corresponds with none of [the] scenarios" in Globus's risk disclosures contradicts its conclusion that those risk disclosures provided meaningful cautionary language. *See infra* at §C1.

### (2) The District Court's Distinction Between "Risk" And "Business Decision" Has No Meaning Or Effect

To evade the plain meaning of Defendants' risk disclosures, the district court fashioned a false dichotomy between "business decisions" and the type of "risks" that companies disclose in their risk disclosures. *See* (A14) (holding that Defendants' decision to terminate Vortex "was not [a] risk; it was a business decision").[13] This wrongly assumes that risks and business decisions are mutually exclusive. Taking certain business decisions can be fraught with risks about which Defendants were duty-bound to – and did – warn. In this case, a consequence of Globus's decision to induce Vortex to terminate its independent distributorship was the likely adverse, material effect on Globus's sales. Defendants admitted as much to analysts during the August 5, 2014 earnings call while explaining that, in terminating Vortex, they "understood the risks to our short-term results" (A53-A54, ¶55) and were hopeful that "we've only taken a small step backwards to take two steps forward." (A332). In other words, it is reversible error for the district court to have classified the Company's decision to terminate Vortex as a business decision,

---

[13] *See also id.* ("Plaintiff fundamentally mistakes the difference between a risk disclosure, which informs the public as to areas in which a company's business could be affected by outside forces, and a business decision, which is a deliberate act a company takes in light of its own best interests.").

rather than a risk. Contrary to the district court's assertion, for which it cites no case, a company's risk disclosures need not be limited only to an enumeration of "outside forces" which may affect its business. *See* (A14).[14]

Indeed, the risk disclosures Defendants included in the 2013 10-K and that they incorporated in the April 30 10-Q, refute such an assertion because, in these SEC filings, Defendants discuss various risks that arise primarily from their own business decisions. *See* (A110-A139). For example, Defendants warned of risks that might result from their decisions to: (a) "grow our business through acquisitions of or investments in new or complementary businesses, products or technologies," (A118), or (b) "invest or spend . . . capital in ways . . . which may not yield a return." (A137). Defendants likewise warned of risks that might result from the Company's failure to: (c) "successfully implement our business strategy," (A118), (d) "properly

---

[14] *In re Home Health Corp. of America, Inc. Securities Litigation*, No 98-CV-834 WHY, 1999 WL 79057 (E.D. Pa. Jan. 29, 1999) is instructive. In that case, a company made the business decision to terminate contracts with two managed care organizations ("MCOs"), but failed to disclose those terminations. *Id.* at *9-10. The court found that the company's risk disclosure—which warned that the company might not be able to "maintain existing referral sources" and that the "loss of any significant referral sources" could have an adverse effect on the company's financial results—were misleading because they failed to disclose that this risk had materialized once the company decided to terminate the contracts with the MCOs. *Id.* "Contrary to defendants' assertion, [the risk disclosure] does not protect defendants' omission of information about past terminations under the safe harbor provision. Instead, ***these statements support plaintiffs' assertion that MCO terminations are material events which should have been disclosed***." *Id.* at *10 (emphasis added).

manage our anticipated growth," (A121), (e) "maintain high levels of inventory," (A122), (f) "manage our planned international expansion effectively," (A117), (g) "comply with applicable requirements" imposed by "the FDA and corresponding state and foreign regulatory agencies," (A119), or (h) "obtain or maintain foreign regulatory approvals." (A122). Defendants also warned investors that the Company may decide to: (i) "cease marketing or recall [the Company's] modified products until clearances are obtained," (A127), or (j) "engage in the off-label promotion of our products," (A130), and that certain risks may flow from these decisions.

Finally, the district court's ruling ignored the historical business realities concerning the risk of distributor disruption at Globus. During the conference call in which Defendants disclosed the Vortex termination, analysts asked the Company's top officers about events in or around 2010, when Globus experienced "distributor turnover" and "it took a year to 15 months to get that territory kind of back up to where it had been." (A332). Defendant Paul responded by admitting that it "actually took us almost two years to get back to where we were." *Id.* Defendant Baron told the analyst: "[Y]our memory is accurate and that was the situation that [Defendant Paul] referred to *where the company itself has decided to take the decision*." *Id*. (emphasis added). In other words, the previous "distributor turnover" incident about which the analyst had asked was also a case where Globus itself had made the business decision to terminate the distributor, not where the distributor

29

elected to stop doing business with Globus. Multiple analysts asked follow-up questions about the Vortex termination and the termination of the prior distributor (which apparently was L5 Surgical).[15] *See* (A328-A337). These facts strongly support the inference that the risk disclosures concerning distributor disruption in Globus's March 14, 2014 10-K were specifically meant to encompass situations in which Globus made business decisions to terminate distributors, because that is precisely what had caused a material disruption in Globus's business in the past with L5 Surgical.[16]

Defendants' discussion of the potential adverse effects that may result from their own business decisions and the colloquy during the August 5 Call gut the district court's unsupported assertion that risks to the Company's business arise only

---

[15] This inference is supported by Defendant Paul's statement during the August 5 Call that "[s]ince our inception, this [*i.e.*, the Vortex termination] is really the second [distributor] of any significance that we've had to not renew." (A334). The other distributor terminated by Globus was L5 Surgical, whom Globus sued in December, 2009, and whose termination disrupted Globus's business for approximately two years. *See* (A139; A90-A91).

[16] The district court noted that Globus's historical distribution model was changing, as Globus had "'announced to investors a plan under which it would gradually transition its sales from a network of independent distributors, such as Vortex, to a cadre of in-house sale representatives.'" (A20) (quoting A42, ¶29). While this plan was within the bounds of Defendants' business judgment, the announcement of this plan did not diminish Defendants' duty to disclose specific instances when the Company ceased doing business with significant distributors whose termination could materially disrupt the Company's sales, even if that disruption was expected to be temporary and in the long-term interests of the Company.

from "outside forces." The district court's error – finding a dichotomy between risks and "business decisions" – therefore, finds no support either in fact, law, or logic. No doubt exists that the risk disclosures in question encompass the cessation of a significant distributor relationship irrespective of who terminates whom.

**b)    Even Under The District Court's Artificially Narrow Reading Of Globus's Risk Disclosures, Defendants Had A Duty To Disclose The Cessation Of The Distributor Relationship With Vortex**

Even if the district court's narrow reading of Globus's risk disclosures were correct – *i.e.*, if the warning only concerned the risk that distributors might elect not to continue to do business with Globus, Defendants were still obligated to disclose the termination of Globus's relationship with Vortex.[17] While Globus *constructively* terminated its relationship with Vortex, the Complaint indisputably alleges that Vortex, as a matter of *actual* (rather than constructive) fact, terminated the relationship with Globus by rejecting renewal of the EDA.[18] By definition, a

---

[17] Plaintiff makes this argument only with respect to the risk disclosures in the April 30 10-Q. By that time, as the district court found, Vortex had already rejected the new EDA and ceased distributing Globus products. *See* (A17).

[18] As noted by the district court, Defendants themselves emphasized the significance of the distinction between constructive and actual termination. *See* (A16) ("Defendants argue that the Amended Complaint pleads only that Globus *constructively* terminated Vortex on April 18, 2014, and that there are no allegations as to when Vortex was *in fact* terminated") (emphasis in original).

constructive termination is a legally imputed fiction "not existing in fact." Black's Law Dictionary (10th ed. 2014) (definition of "constructive"). Here, the Complaint alleges that Vortex terminated the relationship "in fact." Globus presented Vortex with a contract proposal, "[o]n a take it or leave it basis" and "with the knowledge that [Vortex] would not accept its terms," and Vortex "rejected" it and "did not accept the Company's proposal." (A44, ¶35-A45, ¶36). In other words, the Complaint specifically alleges that Vortex "elect[ed] not to work with Globus in the future." (A21).

Since this Court must take these allegations in the Complaint as true and draw all reasonable inferences therefrom in Plaintiff's favor,[19] this Court should hold that Globus's risk disclosures warned of the exact event that had, by that time, already occurred. Defendants cautioned investors that one of its independent distributor might "cease to do business" with the Company, and that is precisely what the Complaint alleges happened. In holding to the contrary, the district court erred.

### B.    The Complaint Adequately Pleads The Falsity Of Defendants' 2014 Revenue Forecast

The district court erred in holding that "Plaintiff failed to plead that the projections were false or misleading when made." (A12). The district court

---

[19] *See, e.g.*, *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 867, 885 (3d Cir. 2000).

mischaracterized Plaintiff's allegations as "conclusory" and amounting to "nothing but his own speculation." (A11).

Forecasts, opinions about future events, and other forward-looking statements are actionable if they either lack a reasonable basis at the time they were made or mislead investors about material facts underlying that belief. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) (a statement of opinion is actionable if it omits material facts concerning the speaker's basis for the opinion, which, if disclosed, would "conflict with what a reasonable investor would take from the statement"); *In re Burlington Coat Factory Securities Litigation*, 114 F.3d at 1428 (an opinion about future events is actionable if it lacks a reasonable basis when made).

The Complaint alleges that the Company's revenue forecast for fiscal 2014 of $480-486 million, which Defendants issued during both the February 26 and April 29 Calls, was false and misleading. Defendants lacked a reasonable basis for their 2014 forecast, *see Burlington Coat Factory*, 114 F.3d at 1428, because their guidance incorporated projected revenue from Vortex for the remainder of the fiscal year. (A53-A54, ¶55). Defendants included Vortex revenue even though they already "had determined to terminate the Vortex distributorship and replace Vortex with a new, in-house sales representative to cover the territory," (A51, ¶49), or had already terminated Vortex, (A52, ¶52), and despite knowing that similar distributor

33

losses in the past had taken the Company anywhere from one to two years to recover from. (A51, ¶49; A52, ¶52).

For similar reasons, Defendants' original forecast misled investors about material facts underlying their forecast. *See Omnicare,* 135 S. Ct. at 1329. Defendants omitted from their statements during the February 26 and April 29 Calls that the original forecast incorporated projected revenues from Vortex for the remainder of the fiscal year, that Defendants either had determined to terminate or had already terminated Vortex, and that, based on prior recent experience, the Company would not recover financially from the loss of Vortex for at least one year. A reasonable investor, however, would have assumed from Defendants' statements during the February 26 and April 29 Calls that the Company incorporated all planned distributor turnover into the projection.

Based upon this conflict between the facts known to Defendants and what a reasonable investor would have assumed from the February 26 and April 29 Calls, therefore, Defendants are liable under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See Omnicare*, 135 S. Ct. at 1329 (holding that "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what

a reasonable investor would take from the statement itself, then §11's omissions clause creates liability").[20]

Although the district court determined that the Complaint's allegations of falsity are "conclusory" or based on "speculation," (A11), they are neither.  With respect to Plaintiff's allegation that Defendants included expected Vortex revenues into their original forecast, the district court overlooked that Defendant Baron stated that "***the decision not to renew the distributor and the impact to pricing will affect our top line expectations***.  ***We now expect full year revenue to be in the range of $460 million to $465 million***," a downward revision of the original forecast by $20-21 million.  (A53, ¶54-A54, ¶55); (A327) (emphasis added).  Defendants thus admitted that one of the two reasons for the downward revision of their original forecast was to account for their decision not to renew the Company's contract with Vortex and the resulting financial impact of that decision.  Simply stated, Defendants would not have had to revise their revenue forecast to adjust for the loss of the distributor revenue if they had excluded that revenue to begin with.   Thus, Defendants included the Vortex revenue in their revenue forecast with actual knowledge that they were going to, and ultimately did, terminate Vortex.  They also

---

[20] "Although *Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act. . . ."  *In re: BP plc. Sec. Litig.*, No. 10-MD-2185 KPE, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016).

knew well the history of terminating distributors, the accompanying loss of material revenue and the time it took to recoup that lost business.

From Defendant Baron's comment, tying the revised revenue forecast to a decline resulting directly from the termination of "the distributor," it is wholly unreasonable to infer that Defendants excluded anticipated revenues attributable to Vortex's from that revenue forecast. Rather, not only does no question exists that Vortex is the distributor to whom Baron referred but the fact that the forecast revision related in part to those revenues indicates that Defendants included them in the original forecast; Defendants would not have had to back them out if they had not originally included them. In mischaracterizing the Complaint's allegation as conclusory or speculative, therefore, the district court ignored the only reasonable conclusion from the Complaint's allegations. *See EP Medsystems*, 235 F.3d at 885 (on review of a motion to dismiss, this Court must "accept as true all the factual allegations in the complaint" and "draw all reasonable inferences in plaintiff's favor").

Nor is the Complaint's allegation that "it was going to take the Company anywhere from one to two years before it would recover financially from the loss of Vortex," (A51, ¶49), conclusory or speculative in nature. This allegation merely paraphrases Defendants' own statement during the August 5 Call that "to get back to the levels that it was . . . that will take at least a year to work through that cycle

and probably more," and Defendants' expression of agreement—"your memory is accurate"—in response to an analyst's recollection that the 2010 instance of "distributor turnover" required "about a year to 15 months to get that territory back up to where it had been." (A328; A332). The district court's erroneous refusal to find the falsity of Defendants' revenue forecast, therefore, is based on its mischaracterization of the Complaint's allegations.

Notwithstanding the Complaint's well-pleaded allegations of falsity, the district court erred, placing "significant[]" weight on its finding that "Globus actually or nearly achieved the original projected results" in the remaining four and a half months of 2014. (A11-A12). In this Circuit, however, whether the Company "actually or nearly" met its projection is wholly irrelevant. This Court has long recognized that "[s]ecurities laws approach matters from an *ex ante* perspective." *Burlington Coat Factory*, 114 F.3d at 1429 n.16. Just as a plaintiff cannot plead "fraud by hindsight," *California Pub. Emp'ees Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004), "[t]he fact that we see in hindsight that earnings per share did in fact turn out to be roughly within the range they were projected does not tell us conclusively that the forecasts were reasonable *at the time they were made*." *Burlington Coat Factory*, 114 F.3d at 1429 n.16 (citations omitted) (emphasis in

original).[21]

Since Circuit precedent precluded the district court from relying upon evidence that "Globus actually or nearly achieved the original projected results" in determining whether the original forecast was false when made, the district court had no factual basis from which to conclude that "the projections were neither 'impossible' nor 'unachievable.'" *See* (A11-A12). This was reversible error.

Even if the district court had not relied on such a flawed premise, its conclusion that "the projections were neither 'impossible' nor 'unachievable,'" (A11-A12), finds no support in the record. No fact of record indicates that the actual 2014 sales Defendants achieved were related in any way whatsoever to Vortex customers. If anything, the fact that Globus ultimately "achieved record sales" during fiscal 2014, illustrates how unattainable the original forecast was at the time it was issued – especially because Defendants then knew that the Company would lose sales from a "significant U.S. distributor" for the remaining eight months of that fiscal year and knew that the loss of Vortex would result in the loss of a "significant

---

[21] *See also, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) (noting that "just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true. Good fortune . . . does not make the falsehood any the less material"); *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010) ("Fraud depends on the state of events when a statement is made, not on what happens later"); *Rubinstein v. Collins*, 20 F.3d at 169 n.34 ("The reasonableness of the grounds for the statements challenged is tested, of course, as of the time that those statements were made.").

amount of [business]" and cause the Company "***short-term*** pain." (A325; A328) (Emphasis added). Thus, the very facts which the district court cites in support of its conclusion actually serves to undermine it.

In resolving a motion to dismiss, the district court was required to "accept as true all the factual allegations in the complaint" and construe the allegations in a light most favorable to Plaintiffs. *Avaya*, 564 F.3d at 264, n. 36; *see also EP Medsystems*, 235 F.3d at 867, 876, 885 (reviewing a motion to dismiss, court will "accept as true all the factual allegations in the complaint" and "draw all reasonable inferences in plaintiff's favor"). In finding that the Complaint "contains no factual allegations from which the Court could plausibly infer . . . how significant Vortex's revenue would have been compared to Globus's total sales," (A11), ignoring the standard this Court requires it to follow, the district court drew reasonable inferences against Plaintiff and not in his favor.

Defendants publicly disclosed that they revised the 2014 forecast downward, by $20-21 million, in material part because of the loss of Vortex revenues. (A53, ¶54-A53-A54, ¶55); (A325). With respect to the pricing pressure issue, Defendant Demski admitted during the August 5 Call that the Company was "able to mitigate this [pricing] pressure to some extent by shifting the mix towards new and better technology." (A325). During the same earnings call, Defendant Baron confirmed that pricing pressure was ***not*** a significant factor in the downward revision of the

39

forecast, stating that the Company expected to "see some mitigation of that price decline through the introduction of new products." (A330). Thus, Defendants admitted that their reason for revising the 2014 revenue forecast was to remove their assumptions relating to revenues from Vortex customers.

Further, when asked by an analyst during the August 5 Call whether Globus "would have changed guidance if not for the distributor issue, and it was just pricing," Defendant Baron replied, "I don't think we should comment on that." (A336). From Defendant Baron's silence the district court should have inferred that Defendants would not have revised their original forecast for 2014 in the absence of the "distributor issue."[22] The district court failed to draw such an inference in Plaintiff's favor. *See* (A11) ("Such silence does not satisfy the particularity requirement imposed by the PSLRA"). This was reversible error.

Applying the proper standard, the Complaint ***does*** contain "factual allegations from which the Court could plausibly infer . . . how significant Vortex's revenue would have been compared to Globus's total sales." (A11). The most plausible inference is that all, or nearly all, of the $20-21 million downward revision from the original forecast was attributable to the loss of Vortex revenues. Again,

---

[22] This is not to say that the *only* plausible inference to be drawn from Defendant Baron's statement is that Defendants would not have revised the original forecast for 2014 but for the "distributor issue." Rather, because such an inference is at least plausible and favors Plaintiff, the district court was required to draw it. *EP Medsystems*, 235 F.3d at 865, 884. By failing to do so, the district court erred.

circumstances would not have forced Defendants to back-out from the forecast the Vortex revenues if they had not included them in the first place.

Further, the district court wholly ignored Defendant Demski's admission that while Globus had been "maintaining some of [Vortex's] business" following the loss of Vortex, the Company had "lost a significant amount of it" and that it "will take at least a year to work through that cycle and probably more" "to get back to the levels that it was." (A328). Defendant Demski also admitted that Defendants "understood the risk to our short-term results" and that the loss of Vortex would cause Globus "short-term pain"; he then expressed hope that it "will be able to recoup these losses and more in the future." (A325). Taking these allegations together with the reasonable inferences therefrom, the Complaint pleads with particularity that Defendants included Vortex revenues in their 2014 revenue forecast.

Citing *Avaya*, 564 F.3d at 266, the district court found that Plaintiff "failed to plead that the projections were false or misleading when made" because Defendants' projections "were neither 'impossible' nor 'unachievable'" when made. (A12). *Avaya*, however, is readily distinguishable. In *Avaya*, the defendant company "exceeded expectations for Q1 FY2005—October 2004 to December 2004," and the facts alleged in the complaint did not belie the conclusion that the projections at issue were possible to achieve. 564 F.3d at 266-67. Indeed, the *Avaya* plaintiffs

specifically pled that "Avaya's first quarter results were *in line with, or better than, analysts' expectations*." *Id.* at 266 n.41 (emphasis added).

Globus, by contrast, despite having "achieved record sales" during fiscal 2014, and reporting "an increase of 9.2% over 2013 sales," (A77), *still missed the lower-most end of the original revenue guidance for 2014*. Further, unlike the allegations in *Avaya*, the allegations of the Complaint here, together with all inferences drawn in Plaintiff's favor, establish that Defendants' original revenue forecast was unattainable when issued. This is especially true in light of Defendants' inclusion of a material amount of Vortex revenue in its forecast despite its knowledge that it could anticipate no material revenue from Vortex and that it would take Globus anywhere from one to two years to recover financially from the loss of Vortex. Since *Avaya* presented no such similar facts, it is inapposite.

Accordingly, the Complaint adequately pleads the falsity of Defendants' original revenue projections for 2014.[23] The district court's findings to the contrary

---

[23] Temporal proximity supports an inference of falsity. *See, e.g.*, *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995) (holding that the approximately two-and-a-half month gap between the positive statements issued by the defendant about the program on January 14-16, 1992 and the defendant's announcement of its decision to terminate the program on April 2, 1992 constituted "circumstantial evidence that the optimistic statements were false when made"). The roughly two-and-a-half month period deemed sufficiently short in *Fecht*, 70 F.3d at 1083-84, aligns with the three-month period here between the Defendants' April 29 issuance of the original revenue forecast and Defendants' August 5 disclosure of the Vortex termination and revision of the revenue projection.

are erroneous.

### C.    Defendants Cannot Avail Themselves Of The PSLRA Safe Harbor

The district court erred in holding that "Plaintiff's claims must be dismissed because the projections fall within the PSLRA's Safe Harbor." (A12).  The PSLRA safe harbor provisions, 15 U.S.C. §78u–5, immunize certain forward-looking statements from liability under §10(b) of the Exchange Act.  This Court recently held that the safe harbor applies if either the "forward-looking statement is . . . identified as [such], and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or the plaintiff fails to prove the forward-looking statement "was made with actual knowledge by [the speaker] that the statement was false or misleading . . . ."  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490, 502-03 (3d Cir. 2016) (citing 15 U.S.C. §78u–5(c)(1)).[24]

Because Defendants' revenue forecast was not accompanied by "meaningful cautionary language" and was made with actual knowledge of its falsity, the district court erred in holding that the PSLRA safe harbor applied.

---

[24] Although the PSLRA provides a third entrance to the safe harbor by immunizing statements that are "immaterial," 15 U.S.C. §78u–5(c)(1)(A)(ii), the materiality of the Vortex termination is not at issue in this appeal because the district court determined such information to be material.  *See* (A19).

43

### 1.     Defendants' Cautionary Language Was Not "Meaningful"

In assessing the safe harbor's applicability, this Court must first determine whether Defendants accompanied their revenue forecast with "meaningful cautionary language." *Avaya,* 564 F.3d at 256.  The district court cited two separate cautionary passages, supporting its conclusion that Defendants' cautionary language was meaningful.  *See* (A13).  Neither passage, however, actually supports the district court's conclusion.

First, the disclosure from Defendants' earnings conference calls is not meaningful.  The district court cited a passage from the transcript of Globus's Fourth Quarter and Year End Earnings Call, held on February 26, 2014.  *See* (A13) (citing A140-A145), prefacing the prepared remarks by Defendants Paul, Demski, and Baron.  (A142).  In the course of delivering the Company's "required legal disclaimers," Globus's Investor Relations Director warned investors that "certain items may be discussed that . . . are subject to many risks, uncertainties and other factors that are difficult to predict and may affect our business and operations," and that "our actual results may differ materially and adversely."  *Id.*

It is well established in this Circuit that such "vague or blanket (boilerplate) disclaimer, which merely warn[] the reader that the investment has risks will ordinarily be inadequate to prevent misinformation."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (quoting *In re Trump Casino Sec.*

*Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)).  This Court requires cautionary language to be "substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  *Id.* (quoting *Trump*, 7 F.3d at 371-72).

Courts in this Circuit have rejected cautionary language as boilerplate and formulaic that is nearly identical to the language on which the district court relied here.  *See In re Emerson Radio Corp. Sec. Litig.*, No. 03-CV-4201 JLL, 2005 WL 8131267, at *10-11 (D.N.J. Dec. 20, 2005) (warning that "our actual results could differ materially from those contained in the forward-looking statements due to a number of factors" is not meaningful); *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896 WJM, 2005 WL 2840336, at *8 (D.N.J. Oct. 27, 2005) (finding "not meaningful and specific enough" warning of "risks and uncertainties that exist" which might cause "results to differ materially from the Company's expectations").  Thus, that Defendants prefaced each of their earnings calls with exactly the same "required legal disclaimers" further supports the conclusion here that such cautionary language is mere boilerplate and not meaningful.  *See, e.g.*, (A142; A148; A152; A212).  The district court erred in concluding that Defendants conference call cautionary language was meaningful.

Next, the district court held that more tailored cautionary language from Globus's 2013 10-K was meaningful, warning investors of "detailed risks

concerning its reliance on independent distributors." (A13). The district court found that "Globus's risk disclosures were meaningful and would warrant the application of the Safe Harbor." (A14).

The district court's opinion in this regard, however, is internally contradictory. Elsewhere in its opinion, *see supra* at §C1, in detail, the district court undermined its own finding that this cautionary language was meaningful, concluding that Globus did ***not*** warn investors of the risk that actually materialized. (A14) ("Globus's decision to replace Vortex with its own staff corresponds with none of those scenarios" listed in Defendants' risk disclosures). As such, the Court found that the circumstances that materialized were dissociated from the risk about which Defendants warned. If the district court were correct, then the risk disclosures at issue could not have been meaningful, disabling Defendants from entering the safe harbor.

As Plaintiff argues above, however, the district court erred: the risk disclosures, warning of the loss of independent distributors, are inextricably related to the circumstances that had materialized by the beginning of the Class Period.[25] As such, in a vacuum and out of context, the district court's finding that the risk disclosures at issue were meaningful was not in error.

---

[25] The district court found that Defendants knew that they intended to terminate Vortex by March, 2014. (A17).

In context, however, the risk disclosures at issue were not meaningful. That is so because even if the risk disclosures were sufficiently "extensive and specific," they cannot be meaningful if the circumstances about which they warned had already occurred.[26] These risk disclosures were not meaningful because, as explained: (1) the risk that the Vortex termination would materially and adversely affect the Company's sales had materialized and was no longer hypothetical; and (2) they misrepresent or omit historical or existing facts or circumstances concerning the Vortex termination and the risks associated therewith. *See supra* at §A.

Accordingly, the district court erred in determining that the cautionary language accompanying Defendants' revenue projections was meaningful and, therefore, that the PSLRA safe harbor immunizes them from liability.

## 2. Defendants Issued Their 2014 Revenue Forecast With Actual Knowledge Of Its Falsity

The district court determined that the Complaint failed to allege that Defendants had actual knowledge of the falsity of their revenue forecast. (A15-A16). The district court overlooked evidence compelling the conclusion that

---

[26] *See Westinghouse*, 90 F.3d at 709 ("[D]efendants' cautionary statements about the *future* did not render those misrepresentations [of known losses and known risks] immaterial") (emphasis in original); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial."); *see also supra* at note 6 (collecting cases).

Defendants included material amounts of Vortex revenue when they knew that Globus would not achieve material sales, if any at all, from Vortex customers.

In assessing the adequacy of the Complaint's allegations of actual knowledge, this Court must consider not only the inferences which may plausibly be drawn from the Complaint in Plaintiff's favor, but also "***plausible*** opposing inferences." *Matrixx*, 563 U.S. at 48 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)) (emphasis added).  This Court must, however, credit Plaintiff's inferences so long as they are "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (citing *Tellabs*, 551 U.S. at 324).  Only if the competing inference is stronger than the inference of scienter to be drawn from the pleading may this Court consider it.  *Id.*

The Complaint adequately alleges that Defendants included a material amount of Vortex revenue in their 2014 revenue forecast.  The Complaint also alleges that Defendants had actual knowledge: (1) that they included material Vortex revenue in their 2014 revenue forecast, (2) when they knew they intended to and ultimately did terminate Vortex and (3) that the termination of an important distributor would cause a loss of all but an immaterial amount of the revenue attributable to that distributor. Defendant Demski admitted during the August 5 Call that, in making the decision not to renew the Vortex distributorship, Defendants "understood the risk to our short-term results," knowing that such a decision would "negatively impact[] our

48

sales" and result in "short-term pain." (A53-A54, ¶55); (A325). Defendants knew of the "negative impact[]" that the Vortex termination would have upon sales revenues in 2014 based on their own recent prior experience. In 2010, Globus experienced a similar instance of "distributor turnover," and according to Defendants Paul and Baron told investors that it had taken the Company anywhere from a year to "almost two years" "to get back to where we were." (A45-A46, ¶39).

The inference that Defendants had actual knowledge of the falsity of their 2014 forecast, based on their inclusion of Vortex revenue, is bolstered by the Complaint's specific allegations regarding the distinct characteristics of the market for spinal implant products and the nature of the relationship between Vortex and its customers. Since sales of spinal implant products made by well-known manufacturers are largely interchangeable, purchasing decisions commonly turn on the existence of a personal or professional relationship between the salesperson and the customer. (A41).[27] Development and maintenance of such relationships require a level of service extending far beyond the initial sale, often resulting in the creation of significant goodwill between the salesperson and the surgeon-customer. *Id.* Vortex, through Long's efforts, had built up significant goodwill among the

---

[27] Defendants admitted the importance of these relationships in their risk disclosures, in which they stated, "We expect our direct sales representatives and independent distributors to develop long-lasting relationships with the surgeons they serve." (A46, ¶41).

prominent surgeons in the region to which it had been assigned by Globus, establishing a stable of loyal spine surgeons, including Dr. Steck, who would usually switch spinal implant brands to align his purchases with the brand being distributed by Long and Vortex.  (A41, ¶26-A42, ¶27).  Defendants knew of the significant influence these customer-salesperson relationships generally had over purchasing decisions, as well as of Vortex's prominence within a region in which Globus was virtually unknown.  (A41, ¶24; A41-A42, ¶26).  That is why Globus recruited Long and Vortex to become its independent distributor in the region in the first place.  (A41-A42, ¶26).

Looking at these facts holistically, because Defendants purposely included a material amount of Vortex revenue they knew Globus was overwhelmingly unlikely to achieve, the district court erred in not finding that Defendants had actual knowledge that their 2014 revenue forecast was false.  The district court erred, inferring, instead, "the Defendants' projections accounted for their change in strategy, and that Defendants revised their projections in August 2014 after the second quarter results indicated that the strategy might not be as successful as anticipated."  (A15-A16).  Again, no question exists that Defendants included a material amount of Vortex revenue in their 2014 forecast.  The only plausible inference to be drawn from the Complaint's allegations is that Defendants disclosed the Vortex termination and announced their revised forecast only after they were

forced to explain why the Company's domestic sales growth for the second quarter of 2014 was "below [its] historical standards."  (A53-A54, ¶55).

In *In re Nash Finch Co.*, 502 F. Supp. 2d 861 (D. Minn. 2007), the court held that the defendant company's earnings projections were made with actual falsity based on similar factual allegations.  The *Nash Finch* plaintiffs alleged that the forecasts of diluted earnings per share for the 2005 fiscal year, issued by the defendants on April 21, 2005 and July 21, 2005, were made with actual knowledge of their falsity.  *Id.* at 866-69.  Although the defendants claimed such projections to be immunized by the PSLRA safe harbor since the plaintiff failed to plead their actual knowledge, the court disagreed.  *Id.* at 877.  Finding the safe harbor inapplicable, the *Nash Finch* court held that the plaintiff had pled with particularity that defendants knew the company was "losing customers that generated millions of dollars in revenue."  *Id.* at 876.  Specifically, the plaintiff alleged, among other things, that the defendants "knew no later than 4/14/05 that Nash Finch would not receive $20 million in revenue in 2005 from Marsh," which was "refusing to purchase product from Nash Finch over dissatisfaction with Nash Finch's private label products."  *Id.* at 880.  Given their undisclosed loss of such a "large customer," the *Nash Finch* defendants "knew that their statements regarding increased earnings . . . were misleading or false."  *Id.*

51

Since the Complaint alleges that Defendants included in their 2014 revenue forecast material revenue from Vortex customers when they had actual knowledge that they could achieve only immaterial contribution from these customers, if any at all, and the district court determined that Defendants knowingly concealed their impending or actual termination of Vortex,[28] it follows that the Complaint adequately pleads Defendants' actual knowledge of the falsity of their revenue forecast. Taken together with the lack of meaningful cautionary language, a finding of actual knowledge requires this Court to conclude that Defendants cannot claim immunity under the PSLRA safe harbor for their false revenue projections. The district court erred in holding to the contrary.

---

[28] *See* (A17) ("A review of the Amended Complaint indicates that Plaintiff has alleged a factual basis to support an inference that Globus knew it was planning to terminate the Vortex relationship prior to the March 13, 2014 10-K and knew that it had already terminated Vortex by the time it filed its April 30, 2014 10-Q").

## VIII.  CONCLUSION[29]

For the foregoing reasons, Plaintiff respectfully requests that this Court reverse the Judgment of the district court and remand with instructions to conduct further proceedings.

Dated: November 21, 2016               Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        By:  /s/ *Jacob A. Goldberg*
                                        Jacob A. Goldberg
                                        Keith Lorenze
                                        101 Greenwood Avenue, Suite 440
                                        Jenkintown, PA 19046
                                        Tel: (215) 600-2817
                                        Fax: (212) 202-3827
                                        Email: jgoldberg@rosenlegal.com
                                               klorenze@rosenlegal.com

---

[29] The district court dismissed Plaintiff's claims under Section 20(a) of the Exchange Act for control person liability, holding that because the Complaint did not plead a primary violation of Section 10(b) and Rule 10b-5 promulgated thereunder, a necessary threshold for pleading a Section 20(a) claim, the Section 20(a) claim failed. (A22).  Upon reversing the district court's holding on Plaintiff's claims that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, this Court should also reverse the district court's dismissal of Plaintiff's Section 20(a).  *Avaya*, 564 F.3d at 280.

**GLANCY, PRONGAY & MURRAY LLP**
Robert V. Prongay
Jason L. Krajcer
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
T: (310) 201-9150
F: (310) 432-1495
Email: rprongay@glancylaw.com
        jkrajcer@glancylaw.com
        clinehan@glancylaw.com

*Attorneys for Appellant Austin J. Williams*

# **<u>CERTIFICATION OF ADMISSION TO BAR</u>**

I, Jacob A. Goldberg, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.


<u>/s/ *Jacob A. Goldberg*</u>
Jacob A. Goldberg

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,538 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection,  version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated:        November 21, 2016

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg

# TABLE OF CONTENTS

**Page**

**Volume I**

Opinion, filed August 25 2016...................................................................A1

Order, filed August 25, 2016 ..............................................................A23

Notice of Appeal, filed September 13, 2016 .......................................A24

**Volume II**

Lower Court Docket.............................................................................A27

Amended Class Action Complaint, filed February 19, 2016 ...............A33

    Exhibit A-Certification ..............................................................A63

Motion to Dismiss Amended Class Action Complaint, and Memorandum of Law in Support Of Defendants' Motion To Dismiss Amended Class Action Complaint, filed March 28, 2016.................................................A66

    Exhibit List ...............................................................................A140

    Exhibit 1-Excerpts from Globus Medical Inc., FY2013 Form 10-K, filed with the SEC, dated March 14, 2014 .............................A105

    Exhibit 2-Excerpts from Globus Medical Inc., Q4 2013 Earnings Call Transcript, dated February 26, 2014........................................A140

    Exhibit 3-Excerpts from Globus Medical Inc., Q2 2014 Earnings Call Transcript, dated April 29, 2014.............................................A146

    Exhibit 4-Excerpts from Globus Medical Inc., Q2 2014 Earnings Call Transcript, dated August 5, 2014............................................A150

Exhibit 5-Excerpts from Globus Medical Inc., Form 8-K filed with the SEC, dated August 5, 2014........................................................................A157

Exhibit 6-Excerpts from Globus Medical Inc., FY2014 Form 10-K, filed with the SEC, dated February 26, 2015 ...........................................A161

Exhibit 7-Excerpts from Globus Medical Inc., FY2012 Form 10-K/A, filed with the SEC, dated June 13, 2013 ..................................................A166

Exhibit 8-Excerpts of H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, dated November 28, 1995 ................................A207

Exhibit 9-Excerpts from Globus Medical Inc., Q3 2014 Earnings Call Transcript, dated October 30, 2014 .........................................................A210

Reply in Support of Defendants' Motion to Dismiss Amended Class Action Complaint, filed June 2, 2016...................................................................A213

Transcript of Oral Argument-Motion to Dismiss held August 10, 2016 ...........A235

Order of September 9, 2016, filed September 12, 2016 .....................................A322

Thomson Reuters Streetevents, Edited Transcript, GMED – Q2 2014 Globus Medical Inc. Earning Call, Event Date/Time: August 05, 2014/9:30PM GMT ............................................................................................................A323

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK SILVERSTEIN,<br>                    **Plaintiff,** | CIVIL ACTION |
| v. | |
| GLOBUS MEDICAL, INC., DAVID C.<br>PAUL, RICHARD A. BARON, DAVID M.<br>DEMSKI and STEVEN M. PAYNE,<br>                    **Defendants.** | NO.  15-5386 |

## OPINION

### I.    INTRODUCTION

In this securities fraud case styled as a class action, Plaintiff alleges that Defendant

Globus Medical, Inc. ("Globus"), a medical device company, and Defendants David C. Paul,

Richard A. Baron, David M. Demski, and Steven M. Payne, Globus executives (collectively,

"Defendants") committed securities fraud by failing to disclose their decision to terminate

Globus's relationship with a major distributor and by issuing revenue forecasts that failed to

account for the loss of that relationship.  Before the Court is Defendants' motion to dismiss.

### II.    BACKGROUND

Globus is a "medical device company focused exclusively on the design, development

and commercialization of musculoskeletal implants."  Am. Compl. ¶¶ 2, 23.  Globus's products

address a broad range of spinal fusion surgical procedures and the treatment of spinal disorders.

*Id*.  As a newcomer in the spinal implant field, Globus relied on a network of independent

distributors who had strong relationships with medical professionals and could market Globus's

products.  *Id*. ¶¶ 25-26.  In 2004, Globus began such a relationship with independent distributor

Vortex Spine, LLC ("Vortex").  *Id*. ¶¶ 4-6.  Vortex and Globus executed an Exclusive

Distributorship Agreement ("EDA"), pursuant to which Vortex agreed to serve as Globus's exclusive distributor covering a territory that encompassed certain portions of Louisiana and Mississippi. *Id*. ¶¶ 5, 26. The 2004 EDA was renewed in 2008 and again in 2010, the latter of which set an expiration date of December 31, 2013. *Id*. ¶ 26.

In or about late 2013, Globus transitioned to a publicly traded company and announced to investors a plan under which it would gradually transition its sales force from a network of independent distributors, including Vortex, to a team of in-house sales representatives. *Id*. ¶ 29. The Amended Complaint alleges that in order to achieve independence from Vortex, Globus engaged in a "scheme" to "str[i]ng Vortex along – promising to negotiate and finalize . . . a new EDA with new sales quotas and commissions rates – while it recruited and secured a new in-house sales representative." ¶¶ 7, 31. Through this negotiation process, Globus "obtained significant confidential and proprietary customer data from Vortex, which it provided to its new territorial sales employee to facilitate the development of a direct relationship between Globus and Vortex's customers." ¶¶ 7, 33. On or about April 18, 2014, Globus advised Vortex that their distributorship relationship was terminated, that no new EDA would be signed, and that it had hired a new in-house sales employee to cover Vortex's territory. *Id*. ¶¶ 34-35.

Plaintiff proposes a Class Period from February 26, 2014 through August 5, 2014. ¶ 1. During this period, Plaintiff alleges that Globus made material misrepresentations and/or omissions with respect to: (1) revenue projections, which Plaintiff argues were based on data that included sales from Vortex that Globus knew it would not receive; and, (2) risk disclosures, which discussed the risk of the loss of distributors in the hypothetical when in actuality Globus knew that it was planning to and did terminate Vortex, a significant distributor.

On February 26, 2014, Globus held an earnings conference call and announced net sales of $434.5 million for its recently completed fiscal year for 2013.  Mot. Ex. 2 at 4.[1]  Earnings per share ("EPS") for 2013 were $0.73.  *Id*. at 6.  In addition, Globus provided financial projections for the 2014 fiscal year.  Globus estimated that sales for fiscal year 2014 would be between $480 million to $486 million, with EPS of $0.90 to $0.92 per share.  Am. Compl. ¶ 48.

On March 14, 2014, Globus filed its 2013 10-K with the SEC.  The 10-K contained a risk disclosure which warned that if Globus were "unable to maintain and expand [its] network of direct sales representatives and independent distributors, [it] may not be able to generate anticipated sales."  *Id*. ¶ 41.  The risk disclosures further state:

> Our operating results are directly dependent upon the sales and marketing efforts of not only our employees, but also our independent distributors.  We expect our direct sales representatives and independent distributors to develop long-lasting relationships with the surgeons they serve.  If our direct sales representatives or independent distributors fail to adequately promote, market and sell our products, our sales could significantly decrease.
>
> We face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network.  ***If any of our direct sales representatives were to leave us, or if any of our independent distributors were to cease to do business with us, our sales could be adversely affected.***  Some of our independent distributors account for a significant portion of our sales volume, and ***if any such independent distributor were to cease to distribute our products, our sales could be adversely affected.***
>
> . . .

---

[1] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal quotation marks omitted).  An exception to this rule, however, is that "a 'document *integral to or explicitly relied upon* in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis added) (alteration in original) (citation and internal quotation marks omitted).  Here, Globus's March 14, 2014 10-K (Mot. Ex. 1), the February 26, 2014 earnings call (Mot. Ex. 2), the April 29, 2014 earnings call (Mot. Ex. 3), and the August 5, 2014 earnings call (Mot. Ex. 4) are all integral to and explicitly relied upon in the Amended Complaint  and thus the Court may consider them without converting the motion into one for summary judgment.  *Burlington*, 114 F.3d at 1426.

A3

> If we are unable to expand our sales and marketing capabilities domestically and internationally, we may not be able to effectively commercialize our products, which would adversely affect our business, results of operations and financial condition.

*Id*. (emphasis added).

On April 29, 2014, Globus held an earnings conference call and provided investors with guidance for the remainder of 2014. Mot. Ex. 3. At this time, Globus reiterated the projections previously provided in February 2014, *i.e.*, sales in the range of $480 million to $486 million, and EPS of $0.90 to $0.92 per share. Am. Compl. ¶ 51.

On April 30, 2014, Globus filed with the SEC a Quarterly Report on Form 10-Q for the period ending March 31, 2013 (the "March 31, 2014 10-Q"). In the report, Globus referred to and reiterated the risk disclosures that appeared in its Annual Report, stating "We have evaluated the information . . . that was disclosed in our 2013 Annual Report on Form 10-K and there have been no significant changes to this information." *Id*. ¶ 45.

On the last day of the Class Period, August 5, 2014, Globus announced financial results for its recently completed second quarter of 2014. *Id*. ¶ 54. At this time, Globus revised downward its financial projections for the full 2014 fiscal year, and told investors it was now anticipating full year sales of between $460 and $465 million, approximately $20 million less than its previous projection. *Id*. ¶ 55. Globus's projection for EPS remained unchanged. *Id*.

That same day, Globus held an earnings call with its investors in which Globus detailed its financial results for the second fiscal quarter of 2014. *Id*. ¶ 55; Mot. Ex. 4. During the call, Defendant Demski stated that domestic sales growth in the quarter was below historical standards and explained that the shortfall in revenue was attributable to two factors: (a) the fact that, "early in the quarter [Globus] made the decision not to renew [its] existing contract with a

4

A4

significant U.S. distributor [Vortex], negatively impacting [its] sales, *id*.; and, (b) the fact that Globus had "experienced an uptick in pricing pressure during the quarter." *Id*. at 3.

With respect to pricing pressure, Globus explained that "[h]ospitals continue to aggressively manage implant cost through contract negotiations," the result of which was lower sales prices. *Id*. at 4, 9. With respect to Vortex, Demski explained: "We made the decision not to renew the distributor contact, based upon our belief that our long-term goals will be better met by going in a different direction. We understood the risk to our short-term results, but we feel very confident that our decision was in the best interest of Globus, and that we will be able to recoup these losses and more in the future." *Id*. at 3. Demski further stated:

> For those of you who have known us for some time, you will recall that we made a comparable decision in 2010 for similar reasons. The decision also negatively impacted our results in the short-term, but was the right long-term decision. Our Company has created significant value since our inception, by following principles that focus on the long-term health of the organization. While these decisions . . . sometimes result in short-term pain, there is no doubt that by consistently following these principles, we have been able to achieve long-term growth and profitability."

*Id*. at 4. Demski was then asked why Globus had not previously disclosed the news about Vortex. He responded: "Well, I don't think it rises to the level of materiality. We have looked at that from a legal standpoint, and it doesn't rise to that level." Am. Compl. ¶ 55; Mot. Ex. 4 at 9.

On August 6, 2014, Globus's shares fell $4.05 per share or 17.9%, closing at $18.51 per share. Am. Compl. ¶ 56.

Globus's Form 10-K for fiscal year 2014 showed earnings of $474.4 million in sales and an EPS of $0.97. Mot. Ex. 6 at 73.[2]

---

[2]   The Court may take judicial notice of SEC filings on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir. 2014) (taking judicial notice on appeal of SEC filings).

### III.    LEGAL STANDARD

Plaintiff asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. "[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) ("*Avaya*") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007)). Because this is a securities fraud case, however, the complaint must satisfy the heightened pleading rules codified in the Private Securities Litigation Reform Act ("PSLRA"). *Id.* Congress adopted these stringent pleading standards as "a check against abusive litigation," recognizing that "[p]rivate securities fraud actions . . . can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs*, 551 U.S. at 313.

The PSLRA "imposes two exacting and distinct pleading requirements." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010). First, with respect to false and misleading statements, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). In other words, the complaint must "state the allegations with factual particularity," including pleading the "who, what, when, where and how." *Avaya*, 564 F.3d at 253. Second, the PSLRA also enhances the requirements of Federal Rule of Civil Procedure 9(b) and requires the complaint to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Aetna*, 617 F.3d at 277 (citing 15 U.S.C. § 78u-4(b)(2)).

6

A6

Both provisions require facts to be pleaded "with particularity." *Avaya*, 564 F.3d at 253. The Third Circuit has explained that "[t]his particularity language echoes precisely Fed. R. Civ. P. 9(b)." *Id*. (citations omitted); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). The PLSRA's requirement for pleading scienter, however, extends beyond Rule 9(b). Under the PSLRA, a plaintiff can no longer plead the requisite scienter element generally. Instead, under the PSLRA's "[e]xacting" pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Avaya*, 564 F.3d at 253 (citing *Tellabs*, 551 U.S. at 320). A strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. The Court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267-68 (quoting *Tellabs*, 551 U.S. at 321).

Plaintiff must satisfy the above pleading requirements whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. The PSLRA "imposes additional burdens, however, with respect to allegations involving predictions." *Id*. at 254. The Safe Harbor provision, 15 U.S.C. § 78u-5(c), immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood. *Id*.

7

A7

## IV.    DISCUSSION

Section 10(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *U.S. v. Schiff*, 602 F.3d 152, 161 (3d Cir. 2010). To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must adequately allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and, (6) loss causation." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir. 2005) (citations omitted). Under Section 10(b) and Rule 10b-5, a plaintiff must plead that each challenged statement contains an "untrue statement of a material fact or . . . omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Avaya*, 564 F.3d at 259 (citation omitted).

Plaintiff challenges as false and misleading two types of statements: (1) Globus's earnings projections as articulated on February 26, 2014 and reiterated on April 29, 2014, which are forward-looking statements, and, (2) Globus's risk disclosures in its Annual Report, filed on March 13, 2014 and its April 30, 2014 10-Q, which Plaintiff argues contain material omissions of historical fact. Defendants argue that Plaintiff's allegations with respect to both types of statements fail because he has failed to plead a material misrepresentation or scienter. Mot. at 9. In addition, they argue that Plaintiff has failed to plead sufficient facts showing that the forward-looking statements are not entitled to the PSLRA's statutory Safe Harbor. *Id.*; 15 U.S.C. §¶ 78u-5(c); *Aetna*, 617 F.3d at 278; *Avaya*, 564 F.3d at 253-54.

8

A8

A.    *Forward Looking Statements*

"The federal securities laws do not obligate companies to disclose their internal

forecasts." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427. However, if a company

voluntarily chooses to disclose a forecast or projection, the company must have a reasonable

basis for making that disclosure. *Id*. (citations omitted). To survive a motion to dismiss,

therefore, Plaintiff bears the burden of "plead[ing] factual allegations, not hypotheticals,

sufficient to reasonably allow the inference" that the forecasts were made with either: (1)

inadequate consideration of the available data; or, (2) the use of unsound forecasting

methodology." *Id*. (citations omitted).

Here, Plaintiff alleges that Globus's projections on February 26, 2014 for fiscal year 2014

sales ranging from $480-486 million were false and misleading because they "incorporated

Vortex's sales figures for the remainder of the 2014 fiscal year" despite the fact that Globus

knew it would terminate Vortex, that "the termination of Vortex would have a substantial,

negative impact . . . upon the Company's sales for at least the next year or more, and that, as a

result, "the assumptions had changed drastically for the worse." Am. Compl. ¶¶ 22, 48, 51.

Plaintiff argues that in light of Globus's plan to terminate its contract with Vortex, it knew that

the projections it made for fiscal year 2014 were "untenable," "unattainable," "impossible," and

"false." Opp'n at 2, 8. Defendants argue that Plaintiff's allegations are conclusory and fail to

meet the exacting requirements set forth in the PSLRA. Defendants further argue that the

projections are entitled to Safe Harbor protection because the accompanying cautionary language

was sufficiently specific, the projections were not material, and they were not made with actual

knowledge of falsity.

A9

1.      **False or Misleading**

Defendants argue that Plaintiff failed to plead facts from which the Court can reasonably

infer that the projections were misleading at the time they were made.  *See In re NAHC, Inc. Sec.*

*Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have

been misleading at the time it was made; liability cannot be imposed on the basis of subsequent

events.").  In particular, Defendants argue that Plaintiff fails to satisfy the heightened pleading

standards under the PSLRA because he has not pled any facts detailing Vortex's actual historical

sales at the time Globus made the challenged projections or the amount of sales that Vortex

contributed from the Louisiana and Mississippi territory compared to Globus's total sales.  Mot.

at 10.  In addition, Defendants argue that Plaintiff has failed to plead what Globus projected with

respect to Vortex's sales, what Vortex's sales actually were for the year, the amount of the

shortfall from Vortex, how the shortfalls from Vortex impacted Globus, and the dates.  *Id.* at 11

(citing *Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, No. 09-2642, 2010 WL

3749459, at *2, *7, *8 (E.D. Pa. Sept. 27, 2010)).  Without such facts, Defendants argue, there is

no basis for the Court to conclude that the loss of Vortex would have had a "substantial, negative

impact" on Globus's sales.  *Id.* at 10.  In reality, Defendants argue, there was nothing "false,

unattainable, or impossible about those projections."  Hr'g Tr. at 12.  Rather, Defendants assert,

the revised projections were merely a "midcourse correction, a conservative correction" that

ultimately "turned out to be way too conservative" given that the end of year results essentially

met the original projections.  *Id.*  Indeed, Globus's net revenue for fiscal year 2014 was a

"record" $474.4 million, which was just 1.17% below the lower range projected in February and

April.  Mot. at 13.

In response, Plaintiff asserts that he has adequately pled falsity because "[i]ssuing sales

guidance based on projected sales from a distributor which the Company knows it will terminate

A10

is false and misleading because it is based on false or highly likely assumptions." Opp'n at 8.

Plaintiff points specifically to his allegations that the projections "incorporated projected

revenues from Vortex for the remainder of the fiscal year, even though Defendants 'knew that

they had determined to terminate the Vortex distributorship and replace Vortex with a new, in-

house sales representative to cover the territory' and knew that it 'was going to take the

Company anywhere from one to two years before it would recover financially from the loss of

Vortex.'" *Id*. at 9 (citing Am. Compl. ¶¶ 49-50). But, as Defendants note, these allegations are

nothing more than conclusory assertions. The Amended Complaint contains no factual

allegations from which the Court could plausibly infer that the projections: a) incorporated

revenue from Vortex; or b) how significant Vortex's revenue would have been compared to

Globus's total sales. At oral argument, counsel for Plaintiff additionally pointed to statements

made during the August 5, 2014 call that he asserts support falsity. In particular, counsel pointed

to a question from an analyst asking if Globus "would have changed guidance if not for the

distributor issue, and it was just the pricing," to which Defendant Baron replied, "To be honest, I

don't think we should comment on that." Hr'g Tr. at 55. Plaintiff interprets Defendant Baron's

silence as an admission that the projections accounted for revenue from Vortex. Such silence

does not satisfy the particularity requirement imposed by the PSLRA.

Globus made projections that it later adjusted downward but ultimately accomplished

anyway. Plaintiff believes that the projections were actionably false because they included

revenue from Vortex that should not have been included in light of Defendants' decision to

terminate the relationship, but he has pointed to nothing but his own speculation that the

projections in fact included such revenue. More significantly, because Globus actually or nearly

achieved the original projected results, it follows that the projections were neither "impossible"

11

nor "unachievable." Accordingly, Plaintiff has failed to plead that the projections were false or misleading when made. *See Avaya*, 564 F.3d at 266 ("Defendants contend that, at the time of the forecast-related statements . . . the projections were possible to achieve. The facts alleged in the Complaint, when viewed against the backdrop of the successful Q1 results, do not belie this conclusion. We therefore agree with defendants that Shareholders have failed to plead with the requisite particularity the allegation that the October and January forecasts were false or misleading when made.").

### 2.    Applicability of Safe Harbor

Although Plaintiff's failure to plead that the projections were false or misleading is itself sufficient to dispose of his claims with respect to those projections, it is also the case that Plaintiff's claims must be dismissed because the projections fall within the PSLRA's Safe Harbor. As discussed above, the Safe Harbor provisions of the PSLRA shield from liability any forward-looking statement that is: (1) accompanied by meaningful cautionary statements; (2) is immaterial; or (3) was not made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1).

### a.    *Cautionary Language*

"Cautionary language must be 'extensive and specific.'" *Avaya*, 564 F.3d at 256 (citing *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). Vague or boilerplate disclaimers which "merely warn[] the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id*. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions" which the plaintiff challenges. *Id*. (citation omitted).

Here, Defendants argue that Globus provided warnings with respect to the revenue projections that satisfy the above criteria both when it provided its guidance on February 26,

A12

2014 and when it reiterated the guidance on April 29, 2014.  Mot. at 15.  Specifically, the risk

disclosures warned that:

> During this call, certain items may be discussed that are not based entirely on historical
> facts.  These items should be considered forward-looking statements and are subject to
> many risks, uncertainties and other factors that are difficult to predict and may affect our
> businesses and operations.  As a result, our actual results may differ materially and
> adversely from those expressed or implied by our forward-looking statements.
> . . .
>
> We undertake no obligation and do not intend to update any forward-looking statements
> as a result of new information or future events or circumstances arising after the date on
> which it was made.  The financial information discussed in connection with this call
> reflects estimates based on information available at this time and could differ materially
> from the amounts ultimately reported on our 2013 Form 10-K.

Mot. Ex. 2.  In addition Globus provided detailed risks concerning its reliance on independent

distributors.  It warned that if it is "unable to maintain and expand our network of . . .

independent distributors, [Globus] may not be able to generate anticipated sales."  Am Compl. ¶

41.  Globus further stated:

> Our operating results are directly dependent upon the sales and marketing efforts of not
> only our employees, but also our independent distributors.  We expect our direct sales
> representatives and independent distributors to develop long-lasting relationships with the
> surgeons they serve.  If our direct sales representatives or independent distributors fail to
> adequately promote, market and sell our products, our sales could significantly decrease.
>
> . . .
>
> Some of our independent distributors account for a significant portion of our sales
> volume, and if any such independent distributor were to case to distribute our products,
> our sales could be adversely affected. . . . which may or may not prevent our sales from
> being adversely affected.  If [an] independent distributor were to depart and be retained
> by one of our competitors, we may be unable to prevent them from helping competitors
> solicit business from our existing customers, which could further affect our sales. . . .
> Failure to hire or retain qualified direct sales representatives or independent distributors
> would prevent us from maintaining or expanding our business and generating sales.

Mot. Ex. 1.

Defendants argue that these cautionary statements include a detailed list of factors that could affect Globus's business. Mot. at 16. Plaintiff, on the other hand, argues that the above disclosures were not meaningful because they failed to account for the loss of Vortex. Opp'n at 15-17. Plaintiff argues that by February 24, 2014, Defendants already knew that they had decided to terminate Vortex, and by April 28, 2014, the relationship with Vortex had already been severed. *Id.* Thus, Plaintiff concludes, the risks Globus warned were meaningless because they had "already come to pass." *Id.* at 17.

Plaintiff fundamentally mistakes the difference between a risk disclosure, which informs the public as to areas in which a company's business could be affected by outside forces, and a business decision, which is a deliberate act a company takes in light of its own best interests. Here, Globus warned investors that it *risked* the loss of distributors who choose to take their business elsewhere. It did not warn about its "determination to terminate Vortex" because that was not risk; it was a business decision. Thus, the fact that Globus knew but did not disclose the fact that it had decided to terminate the relationship with Vortex, or that had already terminated its relationship with Vortex, does not render those disclosures misleading. Globus warned that distributors might "cease" to do business with Globus, "fail" to promote Globus's products, "depart," or "be retained by other companies." Globus's decision to replace Vortex with its own staff corresponds with none of those scenarios. Accordingly, the Court finds that Globus's risk disclosures were meaningful and would warrant the application of the Safe Harbor.

### b.    *Scienter*

Having concluded that Plaintiff has failed to plead a misstatement with respect to Globus's projects and that Defendants are entitled to protection under the Safe Harbor for forward-looking statements, the Court need not separately address whether Defendants are also entitled to either of the other Safe Harbor provisions, *i.e.*, immateriality and scienter. However,

14

A14

the Court will briefly note that Plaintiff has clearly failed to plead facts that would establish

actual knowledge of falsity.  Plaintiff argues that he has pleaded actual knowledge by pointing to

his allegations that Globus knew it would terminate its relationship with Vortex at the time it

made its projections in February 2014 and that it knew it had already terminated its relationship

with Vortex at the time it reiterated those projections in April 2014.  *See* Opp'n at 19-20.  Again,

Plaintiff conflates two distinct concepts.  The relevant inquiry here is not whether Globus knew

that it would lose Vortex's sales but whether Globus knew in February and April 2014 that as a

result of losing Vortex its projections were false.

  Plaintiff has pointed to no such evidence.  For example, Plaintiff points to Demski's

statement during the August 5, 2014 earnings call concerning Globus's decision in 2010 to

terminate a contract with another distributor, which Demski described as causing "short-term

pain."  Hr'g Tr. at 52.  Plaintiff argues that the Court can infer from this statement that Globus

knew based on its experience in 2010 that terminating the contract with Vortex would cause

similar short-term pain.  *Id.*  But simply knowing that the loss of a distributor may cause a drop

in sales does not mean that Globus failed to account for this drop in its projections.  As Plaintiff

himself alleges, Globus was engaged in a strategy to "gradually transition its sales force from a

network of independent distributors, such as Vortex, to a cadre of in-house sales

representatives."  Am. Compl. ¶ 29.  Indeed, Globus's risk disclosures are replete with references

to the fact that its sales depend upon the efforts of both "direct sales representatives" and

"independent distributors."  *See, e.g.*, Mot. Ex 1 at 28.  Given the paucity of factual allegations

supporting Plaintiff's theory that Defendants incorporated Vortex's sales into their projections,

the much more plausible inference from the facts alleged is that the Defendants' projections

accounted for their change in strategy, and that Defendants revised their projections in August

2014 after the second quarter results indicated that the strategy might not be as successful as anticipated.  Accordingly, the Court rejects Plaintiffs assertions that he has provided a strong inference of actual knowledge that the projections were false or misleading.  *See Tellabs*, 551 U.S. at 314 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

### B.    *Historical Statements*

Plaintiff's allegations with respect to historical statements fare no better.  The Amended Complaint alleges that Globus's risk disclosures in its March 13, 2014 10-K and April 30, 2014 10-Q were materially misleading because they omitted the fact that Defendants had already intended to terminate Vortex prior to March 14, 2014 and in fact terminated Vortex no later than April 18, 2014.  Opp'n at 11.  Defendants argue that Plaintiff's claim fails to plead facts from which the Court could infer that the risk disclosures were false, that the omissions were material, or that Defendants had a duty to disclose any information about Vortex.  Mot. at 22-23.  Finally, Defendants argue that Plaintiff has failed to adequately plead scienter.  *Id*. at 24.

### 1.    **Falsity**

Defendants argue as an initial matter that Plaintiff has failed to plead that Globus's risk disclosures were false.  Mot. at 22.  With respect to the March 13, 2014 disclosures, Defendants argue that Plaintiff has pled only that "at some unspecified time, there was a 'determination to terminate the Vortex distributorship," but that there are no allegations from which to infer that Globus had made such a determination as early as March 2014.  *Id*.  With respect to the April 30, 2014 risk disclosures, Defendants argue that the Amended Complaint pleads only that Globus *constructively* terminated Vortex on April 18, 2014, and that there are no allegations as to when Vortex was *in fact* terminated.  *Id*.  Thus, Defendants conclude, there is no basis to infer that the risk disclosures were false or misleading in failing to reveal the loss of the Vortex relationship.

16

A review of the Amended Complaint indicates that Plaintiff has alleged a factual basis to support an inference that Globus knew it was planning to terminate the Vortex relationship prior to the March 13, 2014 10-K and knew that it had already terminated Vortex by the time it filed its April 30, 2014 10-Q.  With respect to the former, the Amended Complaint alleges that Globus's contract with Vortex was set to expire in December 2013, Am. Compl. ¶ 26, and that by "late 2013" Globus had announced its plan to transition to in-house sales representatives.  *Id.* ¶ 29.  The Court infers from these facts that by March 13, 2014, Globus knew it was likely to end its relationship with Vortex.  With respect to the April 30, 2014 disclosures, the Amended Complaint alleges that Globus arranged to meet with Vortex on April 18, 2014 to propose a new contract that it knew Vortex would not accept, thus constructively terminating Vortex as a distributor.  *Id.* ¶¶ 34-36.  These allegations are sufficiently specific to infer for purposes of this motion to dismiss that Globus knew prior to filing its April 30, 2014 10-Q that it would no longer be working with Vortex.

### 2.    Material Omission

With respect to materiality, Defendants argue that the Amended Complaint fails to plead with particularity that, assuming Globus improperly included revenue from Vortex in its revenue calculations, any shortfall that can be attributed to the loss of the Vortex relationship was material.  Mot. at 12.  According to Defendants, "two indisputable facts highlight Plaintiff's inability to plead that the non-renewal of the contract with Vortex was material."  *Id.* at 13.  First, Globus earned "record sales of $474.4 million for 2014" despite the loss of Vortex, which meant that their total revenue for fiscal year 2014 was only 1.17% below the pricing guidance provided on February 26, 2014.  *Id.*  Defendants argue that under Third Circuit precedent, similar discrepancies were held to be quantitatively immaterial even in instances in which the stock price dropped after disclosure of the information.  *Id.* (citing *In re Westinghouse Sec. Litig.*, 90 F.3d

17

A17

696, 715 (3d Cir. 1996); *Burlington*, 114 F.3d at 1427 ("Where the data alleged to have been
omitted would have had no more than a negligible impact on a reasonable investor's prediction
of the firm's future earnings, the data can be ruled immaterial as a matter of law.").  Second,
Plaintiff fails to address the fact that during the August 5, 2014 call, Globus identified two issues
as causing the reduced price guidance, *i.e.*, the loss of Vortex *and* increased pricing pressure.
Mot. at 14.  Defendants argue that, without additional facts, there is no way to know the impact
of each contributing factor and thus whether the loss of Vortex had a material impact.  *Id.*

  Plaintiff responds that under clear Third Circuit precedent, information is material if its
disclosure results in an immediate stock price change.  Indeed, while "[o]rdinarily, the law
defines 'material' information as information that would be important to a reasonable investor in
making his or her investment decision," the  Third Circuit has clearly adopted the "efficient
market" theory in which courts measure the materiality of undisclosed information by looking to
stock price movement in the period immediately following the disclosure.  *Burlington*, 114 F.3d
at 1425 ("In the context of an 'efficient' market, the concept of materiality translates into
information that alters the price of the firm's stock.  This is so because efficient markets are
those in which information important to reasonable investors (in effect, the market) is
immediately incorporated into stock prices. ") (internal citations omitted); *see also Oran v.
Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the
materiality of disclosed information may be measured post hoc by looking to the movement, in
the period immediately following disclosure, of the price of the firm's stock.").

  Here, because the information about Vortex was disclosed on August 5, 2014, the Court
looks to the movement in the price of Globus's stock following disclosure to determine if the
information was material.  Plaintiff alleges that on August 6, 2014, Globus's stock price fell

$4.05 per share or 17.9%.  Am. Compl. ¶ 56.  Defendants argue that this change in stock price

could have occurred as a result of Globus's reduced revenue projections, which it concedes

would be material, and not because of Globus's specific relationship with Vortex, one distributor

out of many.  Hr'g Tr. at 63-64.  While Defendants raise an interesting point, those arguments

are appropriate for a motion for summary judgment.  On a motion to dismiss, however, the Court

interprets the facts in the light most favorable to Plaintiff and concludes that he has shown

materiality under *Burlington-Oran*.

However, even accepting for purposes of this motion that the information about Vortex

was material, "[t]his does not end our inquiry" as "[e]ven non-disclosure of material information

will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to

disclose the information."  *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).  "Silence, absent

a duty to disclose, is not misleading under Rule 10b-5."  *Id.* (citing *Basic Inc. v. Levinson*, 485

U.S. 224, 239 n.17 (1988)); *Burlington*, 114 F.3d at 1432 ("Except for specific periodic reporting

requirements[,] . . . there is no general duty on the part of a company to provide the public with

all material information.").  A duty to disclose arises only in three circumstances: where there is

insider trading; a statute requiring disclosure; or, an inaccurate, incomplete or misleading prior

disclosure.  *Oran*, 226 F.3d at 285-86; *see also Schiff*, 602 F.3d at 163 (holding that "the list

describing the derivation of a duty to disclose in *Oran* is exclusive") (citing *Winter Family Trust

v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007)).

Here there is no allegation of insider trading, and Plaintiff appears to concede that there is

no statutory requirement that would give rise to a duty under Section 10(b).[3]  Nor does the

---

[3]     In the Amended Complaint, Plaintiff alleged that Defendants had a duty under the disclosure requirements in
Item 303(a) of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(i), (ii) and Item 303(b), 17 C.F.R. § 229.303(b)(1), (2).
Am. Compl. ¶¶ 43, 47.  In their motion to dismiss, Defendants argue, and Plaintiff concedes, that Item 303 does not
"create an independent cause of action for private plaintiffs" and that "[n]either the language of the regulation nor

19

Amended Complaint contain allegations concerning a prior "incomplete or misleading disclosure," such as a statement in a prior SEC filing in which Globus stated that it planned to maintain its relationship with all of its independent distributors generally or Vortex specifically. Indeed, Plaintiff has not identified a single instance prior to August 5, 2014 in which Globus said anything about Vortex. And, as discussed throughout this Opinion, the Amended Complaint alleges that Globus in fact "announced to investors a plan under which it would gradually transition its sales from a network of independent distributors, such as Vortex, to a cadre of in-house sales representatives, the latter of whom, in the Company's view, would be easier to exercise authority over and whose costs would be controlled." Am. Compl. ¶ 29. Globus' decision to terminate Vortex corresponds entirely with this statement. Thus, none of the three established avenues to finding a duty to disclose apply.

Despite the Third Circuit's clear ruling that the list of duties identified in *Oran* is exhaustive, Plaintiff posits that Globus had a duty to disclose that it terminated its relationship with Vortex under a separate theory. Specifically, Plaintiff argues that a duty arose because the risk disclosures were misleading as a result of the alleged omissions. *See* Opp'n at 11.[4] In support of his position, Plaintiff directs the Court to *Flynn v. Sientra, Inc.*, No. 15-7548, 2016 WL 3360676 (C.D. Cal. June 9, 2016), a recently decided case in which the Central District of California held that a defendant's omission was actionable where the defendant warned about a specific risk knowing that the precise issue had already occurred. In that case, the plaintiff alleged that the defendants' SEC filings contained a risk disclosure that warned of the possibility

the SEC's interpretive releases construing it suggest that it was intended to establish a private cause of action." Mot. at 22-23 (citing *Oran*, 226 F.3d at 287)). Thus, a "violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" and a duty of disclosure under Section 10(b) and Section 10b-5 "must be separately shown." *Oran*, 226 F.3d at 288-89.

[4]     Plaintiff argues that "Defendants fail to argue that there was no Section 10(b) duty to disclose" and that "[a]s such, Defendants concede that there was a duty to disclose the facts regarding the Vortex termination under Section 10(b), and arguments raised on reply should be disregarded." Opp'n at 11-12 n.6.

20

A20

that its manufacturing partner might fail to follow proper manufacturing practices or have significant compliance issues. *Id*. at *11. The *Flynn* complaint also alleged that prior to these disclosures, the defendant had conducted an internal investigation that confirmed regulatory complaints of contamination in its products. The court found the defendants' risk disclosures to be "more than plausibly misleading when viewed in conjunction with Plaintiffs' allegations that serious regulatory issues had already transpired by the time these statements were made." *Id*. Thus, in essence, *Flynn* held that when a company identifies risks it has a duty to speak truthfully concerning whether such risks have already come to pass.

Even assuming such a duty exists, the factual allegations upon which *Flynn* was based are not present here. In *Flynn*, the precise situation that the defendants disclosed as a risk in their disclosures was alleged to have actually taken place. Here, as discussed in the section on cautionary language, the risk that Globus identified in its disclosures was not the same as the event that Plaintiff alleges had come to pass. Specifically, the risk disclosures in Globus's 10-K and 10-Q warned that its sales "could be adversely affected" in two scenarios: (1) "[i]f any of [Globus's] direct sales representatives were to leave [Globus]; or, (2) "if any of [Globus's] independent distributors were to cease to do business with [Globus]." Mot. Ex. 1 at 28. In other words, Globus's disclosures warned against the risk that one of Globus's direct sales representatives or distributors would elect not to work with Globus in the future. What occurred, however, was something different: Plaintiff alleges that Globus independently "determined to terminate" Vortex on its own initiative. *See* Hr'g Tr. at 15. This was a business decision, not a risk that had come to fruition. Accordingly, the Court concludes that Plaintiff has failed to plead an actionable omission.

A21

**C.**    *Section 20(a)*

Section 20(a) creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b).  15 U.S.C. § 78t(a).  Liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person.  *Avaya*, 564 F.3d at 252.  Because Plaintiff has failed to plead a violation of Section 10(b), his claims under Section 20(a) necessarily also fail.  An appropriate order follows.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**

A22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARK SILVERSTEIN,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **GLOBUS MEDICAL, INC., DAVID C.** | **NO.  15-5386** |
| **PAUL, RICHARD A. BARON, DAVID M.** | |
| **DEMSKI and STEVEN M. PAYNE,** | |
| **Defendants.** | |

## <u>O R D E R</u>

     **AND NOW**, this 24th day of August, 2016, upon consideration of Defendants' Motion to

Dismiss Amended Class Action Complaint (ECF No. 20), the Plaintiff's opposition (ECF No. 4),

Defendants' reply (ECF No. 27), oral argument held on August 10, 2016, Plaintiff's August 11,

2016 letter brief (ECF No. 33), and Defendants' August 16, 2016 letter brief (ECF No. 34), **IT**

**IS HEREBY ORDERED** that the motion to dismiss is **GRANTED**.

 

                **BY THE COURT:**

                **/S/WENDY BEETLESTONE, J.**

                _____

                **WENDY BEETLESTONE, J.**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK SILVERSTEIN, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>GLOBUS MEDICAL, INC., ET AL.,<br><br>     Defendants. | No. 15-cv-05386-WB |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Austin J. Williams, Lead Plaintiff in this case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final order, dismissing the case, entered on the 25th day of August, 2016 (ECF Nos. 37-38).

Dated: September 13, 2016

Respectfully Submitted:

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob Goldberg*
Jacob A. Goldberg (PA Bar ID 66399)
Keith Lorenze (PA Bar ID 205689)
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
      klorenze@rosenlegal.com

and

A24

**GLANCY, PRONGAY &
MURRAY, LLP**
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
T: (310) 201-9150
F: (310) 432-1495
Email: rprongay@glancylaw.com
       clinehan@glancylaw.com

*Co-Lead Counsel for Lead Plaintiff
and the Proposed Class*

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on September 13, 2016, I electronically filed the foregoing ***Notice of***

***Appeal*** with the Clerk of Court using the CM/ECF system, which will send notification of such

to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff***
***and the Proposed Class***

A26

**AFFIDAVIT OF SERVICE**

DOCKET NO. 16-3607

-------------------------------------------------------------------------------X

Austin J. Williams; Mark Silverstein

       vs.

Globus Medical, Inc.

-------------------------------------------------------------------------------X


       I, Elissa Matias, swear under the pain and penalty of perjury, that according to law and being over the age of 18, upon my oath depose and say that:

       On November 21, 2016

       I served the Brief and Appendix for Appendix Volume I of II within in the above captioned matter upon:


Lee Albert, Esq.
Email: lalbert@glancylaw.com
Glancy Prongay & Murray
122 East 42nd Street
Suite 2920
New York, NY 10168
(212) 682-5340

Cheryl W. Foung, Esq.
Email: cfoung@wsgr.com
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

Barry M. Kaplan, Esq.
Email: bkaplan@wsgr.com
Gregory L. Watts, Esq.
Email: gwatts@wsgr.com
Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue
Suite 5100
Seattle, WA 98104
(206) 883-2500

Timothy D. Katsiff, Esq.
Email: tkatsiff@morganlewis.com
Marc J. Sonnenfeld, Esq.
Email: msonnenfeld@morganlewis.com
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
(215) 963-4857


via **electronic filing and electronic service**.

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Express Mail.

**Sworn to before me on November 21, 2016**

/s/ Robyn Cocho                                        /s/ Elissa Matias
_____                    _____
Robyn Cocho                                               Elissa Matias
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2022

Job # 269398